Filed 7/10/18 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| WORLD BUSINESS ACADEMY, | B284300 |
| Petitioner and Appellant, | (Los Angeles County Super. Ct. No. BS163811) |
| v. | |
| CALIFORNIA STATE LANDS COMMISSION, | |
| | ORDER MODIFYING OPINION AND DENYING REHEARING PETITION |
| Defendant and Respondent; | |
| | [NO CHANGE IN JUDGMENT] |
| PACIFIC GAS & ELECTRIC COMPANY, | |
| Real Party in Interest and Respondent. | |

THE COURT:

It is ordered that the opinion filed herein on June 13, 2018 be modified as follows:

1.     On page 15, in final full paragraph that begins "The party advocating" delete the sentence "Thus, the project moves forward without preparation of an EIR."

The modified paragraph now reads as follows:

The party advocating for the application of the unusual circumstances exception bears the burden of demonstrating that the project falls within the exception. (*Fairbank v. City of Mill Valley*, *supra*, 75 Cal.App.4th at p. 1259.) If the agency determines that an exemption applies, and no exception forecloses its application, the project is exempt from CEQA and no further environmental review is required. (*Tomlinson*, *supra*, 54 Cal.4th at p. 286.) That is the posture in which this appeal has arisen.

2.    The paragraph commencing on page 17 and ending on page 18, before **IV. Existing Facilities Exemption** has been modified by adding a sentence at the end of the paragraph. It now reads as follows:

This court has no obligation to perfect an inadequate record. To the contrary, the general rule is that "[f]ailure to provide an adequate record concerning an issue challenged on appeal requires that the issue be resolved against the appellants." (*Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 366 (*Eureka*).) We exercise our discretion in favor of not applying that general rule here, however, because appellant belatedly lodged the administrative record on April 26, 2018. We have fully reviewed the lengthy record.

3.    On page 28, fifth line of first full paragraph delete the word "certainly"

Revised sentence now reads:  If a project will have a significant environmental effect, that project necessarily presents unusual circumstances and the party does not need to separately establish that some feature of the project distinguishes it from others in the exempt class.

4.      On page 38, the first full paragraph delete the following sentences:

Evidence of an "exponential" impact on surrounding marine life may well support a fair argument that the lease replacement will have a significant environmental effect.  Yet appellant does not point to any such evidence in support of its sweeping claim.

Revised paragraph now reads:  None of the evidence to which appellant points shows that the lease replacement will change or expand the plant's current marine life impacts beyond the baseline conditions.  Indeed, the sole cited evidence regarding endangered species—a public comment regarding the plant's effect on marine life—does not support its assertions regarding endangered species habitats at all.

The Petition for Rehearing is denied.

_____
EPSTEIN, J.               WILLHITE, J.               COLLINS, J.

3

Filed 6/13/18 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| WORLD BUSINESS ACADEMY, | B284300 |
| Petitioner and Appellant, | (Los Angeles County Super. Ct. No. BS163811) |
| v. | |
| CALIFORNIA STATE LANDS COMMISSION, | |
| Defendant and Respondent; | |
| PACIFIC GAS & ELECTRIC COMPANY, | |
| Real Party in Interest and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mary H. Strobel, Judge. Affirmed.

Humphrey & Rist, Christina A. Humphrey, Thomas A. Rist; Law Offices of J. Kirk Boyd, J. Kirk Boyd for Petitioner and Appellant.

Xavier Becerra, Attorney General, Deborah M. Smith, and Christina Morkner Brown, Deputy Attorneys General for Defendant and Respondent California State Lands Commission.

Shute Mihaly & Weinberger, William J. White as Amicus Curiae on behalf of Respondent California State Lands Commission.

Armbruster Goldsmith & Delvac, Damon P. Mamalakis for Real Party in Interest and Respondent Pacific Gas and Electric Company.

---

Real party in interest and respondent Pacific Gas and Electric Company (PG&E) owns and operates the Diablo Canyon nuclear power plant in San Luis Obispo County. The plant uses water from the Pacific Ocean to operate its cooling systems. The water intake and discharge structures are situated on state-owned submerged and tidal lands overseen by defendant and respondent California State Lands Commission (Commission). PG&E and the Commission entered into two long-term leases, set to expire in August 2018 and May 2019, which authorized PG&E to build and operate the water intake and discharge structures. With those leases nearing expiration, PG&E applied for a consolidated replacement lease extension through 2025, when it plans to cease operating the plant.

The Commission held public hearings about the matter and eventually approved the application. It did not prepare an

2

environmental impact report (EIR) under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] prior to making its determination. Instead, the Commission concluded the lease replacement, which maintained the status quo at the plant, was subject to the "existing facilities" categorical exemption to CEQA (Cal. Code Regs., tit. 14 (Guidelines) § 15301). The Commission further found inapplicable the "unusual circumstances" exception, which supersedes the existing facilities exemption "where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (Guidelines § 15300.2, subd. (c).)

Petitioner and appellant World Business Academy sought an administrative writ and declaratory relief in Los Angeles County Superior Court. It contended that the lease replacement should not have been subject to the existing facilities exemption, and that even if it was, the unusual circumstances exception to the exemption should apply. Appellant further argued that the lease replacement violated the public trust doctrine. The trial court rejected these contentions and denied the writ and declaratory relief. We affirm.

### BACKGROUND

The Diablo Canyon power plant is a two-unit nuclear power plant owned and operated by PG&E. It is adjacent to the Pacific Ocean, near Avila Beach in San Luis Obispo County, on approximately 750 acres of land owned by PG&E. The plant was

---

[1] All further statutory references are to the Public Resources Code unless otherwise indicated.

completed in 1973 and began operations in 1985.  Its two nuclear units still operate today and are licensed by the federal Nuclear Regulatory Commission (NRC) to operate until November 2, 2024 (unit 1) and August 26, 2025 (unit 2).

The plant uses a "once-through" cooling system to cool the nuclear units.  Each day, the cooling system draws more than two billion gallons of seawater from a breakwater-protected intake cove on the coast.  The water is pumped through "traveling water screens" to filter out "ocean debris."  Debris larger than the screening mesh—including plants and fish—gathers or "impinges" on the screens and is subsequently washed off and sent through "[g]rinding and mincing equipment installed in the inlets of the refuse sump."  "Entrained debris smaller than the 3/8-inch screening mesh passes through the cooling system" along with the seawater, which is heated by approximately 20 degrees Fahrenheit during its five-minute journey through the plant. The heated water is then returned to the Pacific Ocean via a discharge channel located in the coastal bluff.

The intake cove, breakwaters, intake structure, and discharge channel are located on state-owned tidal and submerged lands.  The Commission authorized a 49-year lease in 1969, allowing PG&E to construct and operate the intake cove, intake structures and breakwaters on state-owned land.  The Commission authorized a second 49-year lease in May 1970, for the cooling water discharge channel.  The leases had expiration dates of August 27, 2018 and May 31, 2019, respectively, several years before the plant's federal operating licenses are scheduled to expire.

The power plant cannot operate without the cooling system, however, and the cooling system cannot operate without the

4

infrastructure located on the leased lands.  PG&E accordingly submitted an application to the Commission in January 2015 to replace the expiring leases with a single new lease to run coterminously with its federal licensure.[2]

The Commission held a public meeting on the matter on December 18, 2015.  During that meeting, then-Committee chairperson and Lieutenant Governor Gavin Newsom remarked that "every few years, another [seismic] fault is discovered" near the plant, raising "another question mark about its safety and its potential to survive an earthquake. . . ."  He further observed that the original leases, which predated the 1970 enactment of CEQA, never had been given "CEQA consideration."  Newsom queried the extent of CEQA review that might be required in this case. Commission Executive Officer Jennifer Lucchesi assured Newsom that Commission staff would prepare an analysis "with potentially some recommendations on not only an approach and a framework for analyzing the CEQA considerations, but also a framework for looking at the public trust issues" associated with the lease replacement.

Commission staff subsequently prepared an "Informational Update" dated February 9, 2016.  In that update, Commission staff reported that PG&E had taken the position that no environmental review of the lease replacement was necessary under the "existing facilities" categorical exemption to CEQA because the plant was "an existing facility with no change or

---

[2] PG&E submitted a license renewal application to the NRC in 2009.  The NRC initiated an environmental review pursuant to the National Environmental Policy Act and held public environmental scoping meetings in August 2015.  As we discuss *post*, PG&E ultimately withdrew its license renewal application, so its federal licensures will expire in 2024 and 2025.

expansion of an existing use." Commission staff further reported that the existing facilities exemption could be overridden by the unusual circumstances exception, which applies "where there is a 'reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances.' (Cal. Code Regs., tit. 14, § 15300.2, subd. (c).)"

The update then made several observations about the characteristics of the plant and its location. It first noted that the plant "is the only active nuclear power plant in California, supplying approximately 18,000 gigawatt-hours of electricity annually (nearly 10% of California's electricity generation)." It further noted that the plant's "nuclear fuel source and proximity to fault lines distinguish it from other power plants in California." The update also acknowledged the existence of "substantial disagreement" between PG&E and the United States Geological Survey about the risks associated with two fault lines, the Shoreline and the Hosgri, near the plant. PG&E believed the faults posed no hazard to the plant, which was built and retrofitted to withstand a magnitude 7.5 earthquake. In contrast, a seismologist with the U.S. Geological Survey, Jeanne Hardebeck, "believe[d] that a joint seismic event of the Hosgri and Shoreline faults could exceed [the plant]'s design capacity for safe operation, possibly reaching a magnitude of 7.7."

The update concluded this discussion without explicitly identifying any of these characteristics as unusual circumstances or assessing whether any of them would cause the lease replacement to have a significant effect on the environment. Indeed, the update made no recommendation to the Commission regarding application of the existing facilities exemption or the unusual circumstances exception. Instead, it noted that

6

Commission staff "continue[d] to evaluate the appropriate environmental review pursuant to CEQA for this application." The update further advised the Commission that it would need to analyze the lease replacement under the public trust doctrine, pursuant to which the Commission is required to ensure that the tidal and submerged lands under its control are reserved for appropriate uses and the general benefit of the community. (See *Citizens* (2011) 202 Cal.App.4th 549, 570-571.)

In March 2016, representatives from appellant met with Commission staff and delivered a presentation, "On Public Health Issues and Proposed Diablo Canyon CEQA Review," which addressed adverse public health outcomes appellant attributed to the operation of the plant. Appellant's presentation highlighted increased incidence of cancer in San Luis Obispo County, particularly cancers of the thyroid, breast, and skin; and increased incidence of low-birth weight babies and infant mortality "in the 10 zip code areas in Santa Barbara County closest to Diablo Canyon." The presentation also asserted that the incidence of childhood cancer in the vicinity of the Rancho Seco nuclear power plant had decreased "dramatically" after that plant was closed in 1989.

Appellant's presentation was based on a research paper by Joseph Mangano, MPH, MBA, "Report on Health Status of Residents in San Luis Obispo and Santa Barbara Counties Living Near the Diablo Canyon Nuclear Reactors Located in Avila Beach, California." The Commission also received a report challenging Mangano's research. That report, prepared by the San Luis Obispo County Public Health Department, concluded "none of [Magano's] claims hold up" due to "substantial and obvious problems in methodology wherein basic statistical

7

precepts were overlooked," as well as "selection bias in choosing case and control groups."

On June 21, 2016, PG&E entered into an agreement called the "Joint Proposal" with Friends of the Earth, Natural Resources Defense Council, Environment California, International Brotherhood of Electrical Workers Local 1245, Coalition of California Utility Employees, and Alliance for Nuclear Responsibility, at least some of which previously had opposed its lease replacement application.[3]  The signatories agreed that PG&E would "retire Diablo Canyon at the expiration of its current NRC operating licenses"—in 2024 and 2025—and that all signatories "will jointly propose and support the orderly replacement of Diablo Canyon with [greenhouse gas] free resources."  PG&E accordingly agreed to "immediately cease any efforts on its part to renew the Diablo Canyon operating licenses and will ask the NRC to suspend consideration of the pending Diablo Canyon license renewal application pending withdrawal with prejudice of the NRC application upon [California Public Utilities Commission] approval of the Joint Proposal . . . ." Friends of the Earth and the Natural Resources Defense Council subsequently withdrew their objections to the lease replacement application.  Nothing in the Joint Proposal "constrain[ed] or limit[ed] in any way the right of Parties to raise safety or

_____

[3] In its response to the amicus curiae brief filed by Friends of the Earth and Natural Resources Defense Council, appellant World Business Academy asserts that it also "was an integral part of the settlement discussions" that resulted in the Joint Proposal.  It did not sign the document, however, because it "ultimately would not support a political deal that would gut CEQA and grant an exemption in contravention of established law and precedent."

compliance issues related to Diablo Canyon with the NRC or any other government agency, going forward."

Commission staff prepared a final report in advance of the Commission's June 28, 2016 public meeting. In this report, Commission staff concluded that "[t]he issuance of the proposed limited-term lease fits squarely into the categorical exemption for existing facilities under CEQA." It explained, "[t]he infrastructure that is the subject of this proposed lease has existed for over 40 years and are [*sic*] considered part of the existing environmental baseline. There are no operational or physical changes to the DCPP, an existing facility, in connection with the subject lease application."

The report continued, however, that "[t]he question is whether the [unusual circumstances] exception to this exemption applies. It is within the Commission's authority to use its independent judgment, based on the facts, to determine whether there is a reasonable possibility that the issuance of the proposed limited-term interim lease will have a significant effect on the environment due to unusual circumstances based on substantial evidence." The report acknowledged that the coastal plant "is the only active nuclear power plant in California," but noted that "there are many other power plants along California's coast in active seismic regions." The report further noted that the plant "is proximate to several earthquake fault lines, including, [*sic*] the Hosgri, Shoreline, San Andreas, San Simeon, San Luis Bay, and Los Osos faults." The report reiterated the existence of "substantial disagreement" between PG&E and U.S. Geological Survey seismologist Hardebeck. It also noted, however, that the NRC agreed with PG&E that a joint rupture of the Hosgri and Shoreline faults was unlikely. It additionally noted that the

9

plant was designed to withstand ground shaking of up to 0.83 g,[4] and the largest ground motion recorded at the plant to date was 0.042 g, a full order of magnitude less. The report further stated that staff evaluated the possible impact of rising sea levels on the plant and its cooling system infrastructure, and concluded "that sea-level rise will have no impact on the safe function of the DCPP for the limited term of the proposed lease." It did not highlight for the Commission any other potential unusual circumstances, such as the adverse health outcomes appellant discussed at the March 2016 meeting, or their effects on the environment. The report recommended that the Commission apply the existing facilities exemption and authorize the lease replacement.

The report also considered the public trust doctrine. In its analysis of that issue, the Commission considered the environmental impacts of the plant's once-through cooling system. It noted that the State Water Resources Control Board had adopted a new policy on once-through cooling, which would require modifications to the plant if it were to continue operating after 2025. The report concluded that the new policy " appropriately regulates" the impacts to marine life associated with once-through cooling. The report also noted that the Joint Proposal addressed "policy concerns associated with the shutdown of the DCPP in 2025, including replacement energy . . ., workforce transition, and community impacts." It ultimately concluded that the lease replacement "will not significantly interfere with the trusts upon which [public] lands are held or substantially impair the public rights to navigation, fisheries, or

---

[4] Per the report, "g refers to the acceleration that the Earth imparts to objects on or near its surface due to gravity."

other Public Trust needs and values at this time, at this location, and for the limited-term lease beginning June 28, 2016 and ending August 26, 2025."

Executive Officer Lucchesi presented these recommendations during the Commission's public meeting on June 28, 2016.  The Commission also heard comments from numerous members of the public.  Many members of the public, including speakers affiliated with appellant, urged the Commission to require an EIR.  They also presented the Commission with a petition requesting an EIR.  Many other members of the public spoke in support of the lease renewal, and some specifically urged the Commission not to require an EIR.

At the conclusion of the hearing, all three commissioners expressed support for and ultimately voted to adopt the recommendations the Commission staff made in its report.  Executive Officer Lucchesi subsequently filed a notice of exemption finding that the lease renewal was exempt from CEQA under the existing facilities exemption.  The notice contained the following "Reasons for exemption":  "Issuance of a General Lease – Industrial Use for the above-mentioned structure(s) will not cause a physical change in the environment and will not change existing activities in the area.  There is no reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances.  Therefore, the project will not have a significant effect on the environment and the above categorical exemption(s) apply(ies)."

On August 2, 2016, two non-profit organizations, Immaculate Heart Community and appellant World Business Academy, filed a verified petition for a writ of administrative

11

mandate in the Los Angeles County Superior Court.[5]  The petition asserted two causes of action:  (1) the Commission "violated CEQA, prejudicially abused its discretion, failed to proceed in a manner required by law, and failed to support its findings and conclusions with analysis and facts by determining that the issuance of the PG&E Lease was 'not a project' under CEQA, and, by implication, that *no unusual circumstances* existed in this case," and (2) the "Commission violated the Public Trust Doctrine, prejudicially abused its discretion, failed to proceed in a manner required by law, and failed to support its findings and conclusions with analysis and facts by approving the PG&E Lease, which will irreparably injure and deplete public trust resources, including but not limited to, the marine ecosystem in the vicinity of Diablo Canyon, special status fish and wildlife, and California's coastal shoreline, without first requiring the preparation of an EIR under CEQA."  The parties lodged a copy of the administrative record with the trial court and filed a joint appendix containing pertinent excerpts.

The trial court held a hearing on the matter in July 2017.  The trial court denied relief and explained its reasons for doing so in a 54-page minute order.  As is relevant here,[6] the trial court agreed with the Commission that the lease replacement was within the existing facilities exemption to CEQA, and that the unusual circumstances exception to that exemption did not apply.  The trial court further concluded that the Commission's public

---

[5] Only World Business Academy is a party to this appeal.

[6] The trial court's ruling, while quite thorough and helpful in framing the issues before us, is of limited relevance because we directly review the decision of the Commission, not that of the trial court.  (See *post*, at pp. 16-17.)

trust analysis was supported by substantial evidence and was not arbitrary.

Appellant timely appealed.

## DISCUSSION

### I. CEQA Overview

CEQA was enacted in 1970 to advance California's strong public policy of environmental protection. (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285 (*Tomlinson*).) The key requirement of this comprehensive scheme is "the preparation of an EIR for 'any project that a public agency proposes to carry out or approve that may have a significant effect on the environment.' [Citation.]" (*Orange County Water District v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 333.) An EIR is a "detailed," "informational document which, when its preparation is required . . ., shall be considered by every public agency prior to its approval or disapproval of a project. The purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (§ 21061.) Though preparation of an EIR is "often lengthy and expensive" (*City of Santee v. County of San Diego* (2010) 186 Cal.App.4th 55, 63), an EIR must be prepared "'whenever it can be fairly argued on the basis of substantial evidence that [a] project may have significant environmental impact.' [Citations.]" (*American Coatings Association, Inc. v. South Coast Air Quality District* (2012) 54 Cal.4th 446, 473.) This threshold was set low to ensure that CEQA provides effective environmental protection. (*Ibid.*)

13

The first step in determining whether an EIR is required for a particular activity—here, the lease replacement—is to determine whether the activity is a "project" as defined in CEQA. (*Tomlinson, supra,* 54 Cal.4th at p. 286.)  As relevant here, a "project" is "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment" and "is supported, in whole or in part, through contracts . . . from one or more public agencies."  (§ 21065, subd. (b).)  If the proposed activity is a "project," the agency must continue its review.  If not, CEQA does not apply and the environmental review process is complete.

There is no dispute that the lease replacement is a "project."  The Commission thus was required to proceed to the next step, determining if the project qualifies for either a statutory (§ 21080) or categorical exemption (§ 21084, subd. (a); Guidelines § 15300) to CEQA.  Statutory exemptions are absolute exemptions enacted by the Legislature. (*North Coast Rivers Alliance v. Westlands Water District* (2014) 227 Cal.App.4th 832, 850 (*North Coast*).)  "'Projects and activities can be made wholly or partially exempt, as the Legislature chooses, regardless of their potential for adverse [environmental] consequences.' [Citation.]"  (*Ibid.*)  Categorical exemptions are "classes of projects" that the Secretary of the Natural Resources Agency, with the authorization of the Legislature, has determined are exempt because they do not have a significant effect on the environment.  (*Tomlinson, supra,* 54 Cal.4th at p. 286.)  For instance, the Secretary has determined that, as a class, projects involving "negligible or no expansion of an existing use" are exempt from CEQA. (Guidelines § 15301.)  This "existing facilities" exemption is at issue here.

Unlike statutory exemptions, categorical exemptions such as the "existing facilities" exemption are subject to exceptions enumerated in Guidelines section 15300.2. (*North Coast, supra*, 227 Cal.App.4th at p. 850.) An agency may not apply a categorical exemption without considering whether it is foreclosed by an exception. (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1103 (*Berkeley Hillside*).) The most commonly raised exception is the "unusual circumstances" exception at issue here. (See *Fairbank v. City of Mill Valley* (1999) 75 Cal.App.4th 1243, 1259.) That exception provides that a categorical exemption may not be used "where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (Guidelines § 15300.2, subd. (c).) We define these terms in our discussion below.

The party advocating for the application of the unusual circumstances exception bears the burden of demonstrating that the project falls within the exception. (*Fairbank v. City of Mill Valley*, *supra*, 75 Cal.App.4th at p. 1259.) If the agency determines that an exemption applies, and no exception forecloses its application, the project is exempt from CEQA and no further environmental review is required. (*Tomlinson*, *supra*, 54 Cal.4th at p. 286.) Thus, the project moves forward without the preparation of an EIR. That is the posture in which this appeal has arisen.

## II. Standard of Review

"'In considering a petition for a writ of mandate in a CEQA case, "[o]ur task on appeal is 'the same as the trial court's.' [Citation.]" . . . Accordingly, we examine the [Commission's] decision, not the trial court's.' [Citation.]" (*Walters v. City of*

15

*Redondo Beach* (2016) 1 Cal.App.5th 809,  816-817 (*Walters*); see also *Schmitt v. City of Rialto* (1985) 164 Cal.App.3d 494, 501 ["as to administrative determinations properly reviewed in the superior court under the substantial evidence standard or an abuse of discretion standard, the scope of review is the same in the appellate court as it was in the superior court, that is, the appellate court reviews the administrative determination, not that of the superior court, by the same standard as was appropriate in the superior court"]).  Our review thus "is de novo in the sense that we review the agency's actions as opposed to the trial court's decision." (*North Coast*, *supra*, 227 Cal.App.4th at p. 849.)

"[O]ur inquiry extends only to whether there was a prejudicial abuse of discretion" by the agency.  (*North Coast*, *supra*, 227 Cal.App.4th at p. 849, citing § 21168.5.)  "'Such an abuse is established "if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." [Citations.]' [Citation.]" (*Id.* at p. 850.)  To the extent the question presented turns on an interpretation of CEQA, the Guidelines, or the scope of a particular exemption, it is one of law that we review de novo. (*Walters*, *supra*, 1 Cal.App.5th at p. 817.)

## III.   Record on Review

The California Rules of Court provide that the appellate record in a civil case must contain pertinent written documents from the superior court proceedings being reviewed.  (See Cal. Rules of Court, rule 8.120(a).)  The rules further provide that an appellant intending to raise "any issue that requires consideration of the record of an administrative proceeding that was admitted in evidence, refused, or lodged in the superior

court" must either include (Cal. Rules of Court, rule 8.120(a)(2)) or designate for inclusion (Cal. Rules of Court, rule 8.121(b)(2)) the administrative record in the record on appeal. Appellant did not designate or include the administrative record, nor did respondents timely request "that this administrative record be transmitted to the reviewing court." (Cal. Rules of Court, rule 8.123(b)(2).) Instead, the parties initially provided only a joint appellate appendix containing (among other things) the joint appendix of pertinent administrative record excerpts that they filed in the trial court.

These excerpts were not sufficient to facilitate our review. The Commission, whose ruling we review, had before it the full administrative record. We cannot determine if a decision is supported by substantial evidence without assessing the evidence underlying the decision. Indeed, asserting that "[t]he trial court joint appendix documents do not limit the Administrative Record documents that may be cited on appeal," respondents cited directly to pages of the administrative record that were not included in the joint appendix. Appellant agreed with this assertion in its reply brief, in which it also cited directly to the administrative record rather than the joint appendix, but did not lodge the administrative record with this court. Neither side referred to both "the volume and page number" of the administrative record, as required by Rule 8.204(a)(1)(C), nor did they provide parallel citations to the excerpts included in the joint appendix.

This court has no obligation to perfect an inadequate record. To the contrary, the general rule is that "[f]ailure to provide an adequate record concerning an issue challenged on appeal requires that the issue be resolved against the

17

appellants." (*Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 366 (*Eureka*).) We exercise our discretion in favor of not applying that general rule here, however, because appellant belatedly lodged the administrative record on April 26, 2018.

## IV.   Existing Facilities Exemption
### A.   Legal Principles

The existing facilities exemption is one of the categorical exemptions the Secretary of the Natural Resources Agency promulgated after determining that, as a class, existing facilities do not have a significant effect on the environment.  (See Guidelines §§ 15300, 15301.)  The Guidelines define "significant effect on the environment" as "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance."  (Guidelines, § 15382; see also Pub. Resources Code, § 21083, subd. (b).)  Thus, in creating the exemption, the Secretary has found that existing facilities do not create substantial, adverse changes in their surrounding environments.

The "existing facilities" class "consists of the operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of existing public or private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of use beyond that existing at the time of the lead agency's determination."  (Guidelines § 15301.)  When determining whether the existing facilities exemption applies, "The key consideration is whether the project involves negligible or no expansion of an existing use."  (*Ibid.*)  The Guidelines

18

provide a non-exclusive list of "the types of projects which might fall within" the existing facilities exemption.  (*Ibid.*)  That list includes "Existing facilities of both investor and publicly-owned utilities used to provide electric power, natural gas, sewerage, or other public utility services."  (Guidelines § 15301, subd. (b).)

### B.     Application to Nuclear Plants Generally

Appellant argues that the existing facilities exemption is not applicable to nuclear power plants generally.  It first asserts that the exemption by its terms includes only utility structures, like wires and telephone poles, that "convey and distribute" power, not those that generate it.  It further argues that the Secretary of the Natural Resources Agency neither intended nor had the authority to include nuclear power plants within the exemption for 'existing structures'" because categorical exemptions include only "classes of projects that have been determined not to have a significant effect on the environment" (§ 21084, subd. (a)), and a nuclear power plant "*by its de facto operation* has a significant effect on the environment."

To support these arguments, appellant relies on legislative and administrative histories regarding CEQA and revisions to the Guidelines that were not before the Commission but of which the trial court took judicial notice.[7]  Respondents do the same to

_____

[7] The trial court explained:  "[W]hile Petitioners did not submit the legislative history of [Guidelines] section 15301 below, the Commission's findings under section 15301 imply an interpretation of the regulation to include nuclear power plants.  Petitioners argued during the administrative proceedings that section 15301 did not apply.  However, in their opening and reply briefs, Petitioners argue a new legal theory why that is so.  A sound argument can be made that Petitioners did not exhaust on the issue of whether the legislative history supports a conclusion

refute appellant's arguments. Neither side addresses how the trial court's judicial notice of these documents affects our review of the decision of the Commission, which did not have the documents before it, nor do the parties request that we take judicial notice of the legislative or administrative history.

"Extra-record evidence may be considered in quasi-judicial administrative mandamus proceedings only if the evidence was unavailable at the time of the hearing 'in the exercise of reasonable diligence' or if improperly excluded from the record." (*Eureka*, *supra*, 147 Cal.App.4th at p. 367.) As in *Eureka*, "[a]ppellant[ ] made no showing in the trial court that either exception applied, and make[s] no such showing here." (*Ibid.*) Hence, to the extent they rely on legislative and administrative history that was not before the Commission, arguments regarding the scope of the existing facilities exemption may not be raised.

Even were we to consider these arguments on their merits, we would not be persuaded. Appellant argues that "the Secretary was thinking of transmission towers carrying lines and similar structures that do not have a significant effect on the environment, not power *generating* facilities like the core reactors and water intakes at the nuclear plant." It points to administrative history showing that the original list of example projects subject to the existing facilities exemption included

section 15301 does not include nuclear power generating facilities. However, as an alternative analysis, assuming Petitioners did exhaust as to this argument, the court considers the legislative history and associated legal theory to determine the proper interpretation of section 15301. Petitioners' request for judicial notice as to Exhibit 1, and their supplemental request as to Exhibits A to F are GRANTED."

"Existing facilities of both investor, and publicly owned utilities used to *convey or distribute* electric power, natural gas, sewage, etc." (Emphasis added.) The current version of the exemption uses the word "provide" in place of the words "convey or distribute" but is otherwise substantively the same. (See Guidelines § 15301, subd. (b).) Appellant asserts that "no one, including major environmental groups, spoke against the change from convey and distribute to provide." Thus, "based on the plain meaning of the words, it was clear to all that the exemption applied to transmission lines and the distribution of electricity . . . . it was clear to all that the amendment was not intended to be an exemption for nuclear power plants *per se*."

We disagree. The starting point for interpreting a statute or regulation is not its legislative or administrative history but rather the text of the statute or regulation itself. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1097.) We ascribe to words their usual meanings and avoid interpretations that render any language surplusage. (*Ibid.*) "When statutory language is clear, we must apply that language without indulging in interpretation." (*Brewer v. Patel* (1993) 20 Cal.App.4th 1017, 1021.) Here, the existing facilities exemption specifically states that it may be applied to "investor and publicly-owned utilities used to provide electric power . . . ." The Diablo Canyon plant is an investor-owned utility that generates electric power. The word "provide," as commonly understood, plainly encompasses the generation of power in addition to its mere transmission. Moreover, the Guideline states that the list of examples is "not intended to be all-inclusive," and emphasizes that the "key consideration" is not a facility's purpose or use but rather "whether the project involves negligible or no expansion of an

21

existing use." (Guidelines, § 15301.) Appellant correctly observes that "'exemption categories are not expanded or broadened beyond the reasonable scope of their statutory language'" (*Save Our Carmel River v. Monterey Peninsula Water Management District* (2006) 141 Cal.App.4th 677, 697 (*Carmel River*)), but the language here reasonably includes the plant.

Appellant also argues that the Secretary lacks the authority to include nuclear power plants within the existing facilities exemption because section 21084 empowers him or her to exempt only activities that do not have a significant effect on the environment. Appellant further asserts that section 21084 requires the Secretary to "make a finding that the listed classes of projects" in categorical exemptions "do not have a significant effect on the environment," and no such finding can be made as to nuclear power plants due to "[l]egislative history and common sense." These contentions also are not persusasive.

The "class" of projects at issue in the existing facilities exemption is not, as appellant's argument suggests, nuclear power plants. Rather, it is existing facilities of all types. It was reasonable and within the scope of the Secretary's authority to find that such facilities as a class do not have a significant effect on the environment. The continued operation, leasing, or "minor alteration" of facilities, "involving negligible or no expansion of use beyond that existing," is unlikely to cause "a substantial adverse change in the physical conditions which exist in the area affected by the proposed project." (Guidelines §§ 15002, subd. (g), 15301.)

### C.    Application in this Case

Appellant next contends that the Commission failed to undertake a proper legal analysis and make appropriate factual

findings supporting the application of the existing facilities exemption. It claims that the Commission's adoption of the staff report and subsequent issuance of a one-page notice of exemption "did not come close to meeting its burden because it simply accepted as correct a seven-page single-spaced letter from PG&E's lawyer misstating the law of *Berkeley Hillside* and erroneously stating that as long as the operations for Diablo continued the same, then the Commission did not need to make other findings and could simply conclude that the exemption applied." We disagree.

"The findings of an administrative agency can be informal so long as they serve the purposes of enabling the parties to determine whether and on what basis to appeal and enabling a reviewing court to determine the basis for the decision. [Citation.] Findings may consist of adopting the recommendations in a staff report. [Citation.]" (*Carmel River*, *supra*, 141 Cal.App.4th at p. 701.) "[A]n agency's finding that a particular proposed project comes within one of the exempt classes necessarily includes an implied finding that the project has no significant effect on the environment." (*Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 115.) "On review, an agency's categorical exemption determination will be affirmed if supported by substantial evidence that the project fell within the exempt category of projects." (*Ibid.*) On the other hand, "[a]n agency abuses its discretion if there is no basis in the record for its determination that the project was exempt from CEQA." (*Id.* at p. 114.)

Here, the record supports the Commission's application of the existing facilities exemption. The project at issue involves the "leasing . . . of existing public or private structures, facilities,

23

mechanical equipment, or topographical features, involving negligible or no expansion of use beyond that existing at the time of the lead agency's determination." (Guidelines, § 15301.) The plant further fits squarely into one of the listed examples, "investor and publicly-owned utilities used to provide electric power . . . ." (Guidelines, § 15301, subd. (b).) It is undisputed that PG&E has leased the same land from the Commission for nearly 50 years, and that the lease replacement maintains rather than expands the plant's current operational capacity. The letter to which appellant refers contains only a brief outline of the project; more thorough descriptions appear elsewhere in the administrative record, most notably in the formal project description PG&E submitted for the Commission's review. The detailed project descriptions support the Commission's finding that the lease replacement will not expand the existing use of the plant.

Appellant argues that *Berkeley Hillside* requires more analysis because it states that "an agency must weigh the evidence of environmental effects along with all the other evidence relevant to the unusual circumstances determination, and make a finding of fact." (*Berkeley Hillside*, *supra*, 60 Cal.4th at pp. 1115-1116.) The relevant factual finding here is the Commission's implied finding that there were no unusual circumstances. The Commission was not obligated to make specific findings as to each proffered unusual circumstance it rejected, or its bases for doing so.

Appellant also points to *Save Our Big Trees v. City of Santa Cruz* (2015) 241 Cal.App.4th 694, 705, which states, "'[A categorical] exemption can be relied on only if a factual evaluation of the agency's proposed activity reveals that it

24

applies.' (*Muzzy Ranch Co. v. Solano County Airport Land Use Commission* (2007) 41 Cal.4th 374, 386 [ ].)"  Even if the phrase "factual evaluation" means "written findings by the agency," more detailed findings are not required here.  Although it is not clear from the court's use of brackets, the underlying holding from *Muzzy Ranch* states that an agency relying on the so-called "common sense exemption" to CEQA (Guidelines § 15061, subd. (b)(3)) must make "a factual evaluation."  (See *Muzzy Ranch Co. v. Solano County Airport Land Use Commission*, *supra*, 41 Cal.4th at p. 386.)  The Guidelines distinguish the "common sense" exemption from other categorical exemptions, including the existing facilities exemption.  (Compare Guidelines § 15061, subds. (b)(2) & (b)(3).)  *Muzzy Ranch* considered only the "common sense" exemption, so neither it nor *Save Our Big Trees* is authority for the proposition appellant advances here. (See *Riverside County Sheriff's Dept. v. Stiglitz* (2014) 60 Cal.4th 624, 641.)

## V.     Unusual Circumstances Exception

### A.     Legal Principles

The primary dispute in this case concerns the Commission's decision not to apply the unusual circumstances exception to the existing facilities exemption.  The unusual circumstances exception properly is applied "where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (Guidelines § 15300.2, subd. (c).)

A project may have a significant effect on the environment if it "has the potential to degrade the quality of the environment, . . . or to achieve short-term, to the disadvantage of long-term, environmental goals"; is "cumulatively considerable," such that

25

its incremental effects "are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects"; or "will cause substantial adverse effects on human beings, either directly or indirectly." (§ 21083, subds. (b)(1)-(3).) "'To decide whether a given project's environmental effects are likely to be significant, the agency must use some measure of the environment's state absent the project, a measure sometimes referred to as the "baseline" for environmental analysis.' [Citation.]" (*Citizens*, *supra*, 202 Cal.App.4th at p. 557.) The baseline must reflect the existing conditions at the time of the analysis, even if those conditions deviate from the level of development or activity authorized at a site. (*Id.* at p. 558.)

Any significant effect must be attributable to unusual circumstances. Neither CEQA nor the Guidelines define "unusual circumstances." (*Walters*, *supra*, 1 Cal.App.5th at p. 820; see generally Guidelines §§ 15350-15387 [Definitions].) "Whether a particular project presents circumstances that are unusual for projects in an exempt class is an essentially factual inquiry, '" founded 'on the application of the fact-finding tribunal's experience with the mainsprings of human conduct.'"' [Citation.]" (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1114.)

The party challenging an agency's finding that an exemption applies bears the burden of producing evidence supporting that claim. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1105.) In the context of the unusual circumstances exception, that typically requires a two-part showing: "(1) 'that the project has some feature that distinguishes it from others in the exempt class, such as its size or location' and (2) that there is 'a reasonable possibility of a significant effect [on the environment]

26

due to that unusual circumstance.' (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1105.)" (*Respect Life South San Francisco v. City of South San Francisco* (2017) 15 Cal.App.5th 449, 456, footnote omitted.)

We review the agency's factual determination as to whether there is a distinguishing feature—the first prong of the two-part showing—to see if it is supported by substantial evidence. (*Berkeley Hillside*, supra, 60 Cal.4th at p. 1114.) Under this deferential standard of review, our role is different from the agency's. (*Ibid.*) The agency must weigh the evidence before it and make a finding based upon the weight of the competing evidence. As a reviewing court, we do not reweigh the evidence. Instead, we "must affirm [the agency's] finding if there is any substantial evidence, contradicted or uncontradicted, to support it." (*Ibid.*) We "resolv[e] all evidentiary conflicts in the agency's favor and indulg[e] . . . all legitimate and reasonable inferences to uphold the agency's finding. . . ." (*Ibid.*)

If there is substantial evidence of an unusual circumstance, we move to the second prong of the test—whether there is a reasonable possibility that the unusual circumstance will produce a significant effect on the environment. The agency must apply the "fair argument" standard in addressing this issue. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1103.) Under that standard, "'an agency is merely supposed to look to see if the record shows substantial evidence of a fair argument that there may be a significant effect. [Citations.] In other words, the agency is not to weigh the evidence to come to its own conclusion about whether there will be a significant effect.'" (*Id.* at p. 1104.) An agency must find a "fair argument" if there is any substantial evidence to support that conclusion, even if there is competing

27

substantial evidence in the record that the project will not have a significant environmental effect. (*Id.* at p. 1111.) Our review is "limited to determining whether the agency applied the standard 'in [the] manner required by law.'" (*Id.* at p. 1116.)

Alternatively, the party advocating for application of the unusual circumstances exception may make a heightened, one-element showing: that the project *will* have a significant environmental effect. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1105.) If a project certainly will have a significant environmental effect, that project necessarily presents unusual circumstances and the party does not need to separately establish that some feature of the project distinguishes it from others in the exempt class. (*Ibid.*) We apply the deferential substantial evidence review when reviewing this one-step alternative for proving the exception. (See *Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1115-1116.)

### B.     Unusual Circumstances

Appellant contends the Commission's analysis was inadequate because it did not make findings regarding either of the two alternatives for establishing the applicability of the unusual circumstances exception. Indeed, neither the staff report the Commission adopted nor the single-page notice of exemption the Commission prepared includes findings as to whether the lease replacement project presented an unusual circumstance because of some characteristic that distinguished it from other projects in the exempt class. Nor did the Commission explicitly consider whether the project would, in fact, have a significant impact on the environment. Instead, the Commission essentially applied the "fair argument" standard to assess whether there was a reasonable possibility of a significant environmental effect from

28

the project, without first concluding that the project presented an unusual circumstance.

*North Coast, supra*, 227 Cal.App.4th 832, 871, also considered whether there was a reasonable possibility of a significant effect on the environment due to unusual circumstances without first addressing whether there were any unusual circumstances. In that case, the appellate court found it unnecessary to address whether there were unusual circumstances because the exception failed under the second requirement, a reasonable possibility of a significant effect on the environment. (*Ibid.*) We agree with the approach followed in *North Coast*. We accordingly will assume, without deciding, that the lease replacement project presents one or more unusual circumstances.[8] We nevertheless conclude that the Commission properly applied the fair argument standard in considering possible effects on the environment due to any unusual circumstances.

## C.    Significant Effects

"Whether a fair argument can be made that the project may have a significant effect on the environment is to be determined by examining the whole record before the lead agency. Argument, speculation, unsubstantiated opinion or

---

[8] Appellant urges us to affirm the trial court's finding that various characteristics of the plant, including its size, location, and storage of nuclear fuel, constituted unusual circumstances, because PG&E did not appeal it. (The trial court nonetheless found that the exception did not apply because there was no substantial evidence supporting appellant's contention that the lease renewal project may have significant environmental effects.) As we already have explained, we review the findings made by the Commission, not those made by the trial court.

narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment does not constitute substantial evidence." (Guidelines, § 15384, subd. (a).) "Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (Guidelines, § 15384, subd. (b).)

### 1. Baseline

The existence and significance of an environmental effect must be measured from the "baseline," or state of the environment absent the project. Appellant acknowledges that the relevant baseline consists of the existing conditions at the time the agency considers the project. (*Citizens*, *supra*, 202 Cal.App.4th at pp. 557-559.) It contends, however, that the Commission applied a "flawed" baseline because it focused "on whether PG&E is making changes in the way it operates Diablo" rather than on the impacts that could arise from an additional seven years of plant operations, including "new evidence concerning earthquake faults, rising cancer rates, rising infant mortalities, increased marine life destruction and an expanding dead zone, cumulative reactor embrittlement and deterioration, potential devastation from tsunamis, and the cumulative impact from on-site storage of thousands of spent fuel rods containing highly-radioactive plutonium." Appellant claims that these "increasing threats of significant environmental effects from plant deterioration" due to continued use cannot be ignored, and that it is "too draconian to say that business as usual is sufficient and is the conclusive existing condition."

"Where a project involves ongoing operations or a continuation of past activity, the established levels of a particular

use and the physical impacts thereof are considered to be part of the existing environmental baseline." (*North Coast*, *supra*, 227 Cal.App.4th at p. 872.) The baseline accordingly reflects "the current operative condition" of the area being assessed. (*Citizens*, *supra*, 202 Cal.App.4th at p. 558.) Thus, a "proposal to continue existing operations without change would generally have no cognizable impact under CEQA." (*North Coast*, *supra*, 227 Cal.App.4th at pp. 872-873.) As the appellate court explained in *Bloom v. McGurk* (1994) 26 Cal.App.4th 1307, 1315 (*Bloom*), "thousands of permits are renewed each year for the ongoing operation of regulated facilities, and we discern no legislative or regulatory directive to make each such renewal an occasion to examine past CEQA compliance. . . ."

*North Coast* is particularly instructive. The project at issue in *North Coast* was similar to the lease replacement project here: it was a set of two-year renewal contracts "to continue the existing terms for water delivery" from the Central Valley Project. (*Id.* at p. 838.) Like Diablo Canyon, which is large in size and generates nearly ten percent of the state's power, the Central Valley Project was "'the nation's largest water reclamation project and California's largest water supplier.' [Citation.]" (*Id.* at pp. 840.) The underlying contract in *North Coast* was a 40-year agreement whose start date preceded the enactment of CEQA. (See *id.* at p. 844.) Appellants there contended that renewing the water delivery contract would negatively affect nearby wildlife and contribute to increased salt and selenium levels in the soil and groundwater. (*Id.* at p. 873.) Yet the court found that the challenged activities "were clearly part of the existing environmental baseline for Water Districts' ongoing operations," such that "proof of a potential for adverse

31

change in the environment from the conditions under the existing baseline is lacking." (*Id.* at p. 874.) The same is true here; all of the purported environmental effects to which appellant points are incident to and part of the plant's current baseline operations.

Appellant attempts to distinguish *North Coast* on three factual grounds, none of which is persuasive.[9] First, it points out that the project in *North Coast* previously underwent federal environmental review. (See *North Coast, supra*, 227 Cal.App.4th at p. 847.) The lack of a similar review in this case is not determinative. "How present conditions come to exist may interest enforcement agencies, but that is irrelevant to CEQA baseline determinations—even if it means preexisting development will escape environmental review under CEQA." (*Citizens*, *supra*, 202 Cal.App.4th at p. 559.)

Second, appellant emphasizes that the lease renewals in *North Coast* were for two years as opposed to the seven-year lease replacement at issue here. It asserts, without citation to record evidence or legal authority, that "[s]even years is a long time to ignore that people are dying from health issues and that the

---

[9] *Bloom* likewise is not materially distinguishable. There, an operating medical waste incineration facility that had never undergone environmental review sought to renew its operating permit. (*Bloom, supra*, 26 Cal.App.4th at pp. 1310-1311.) The agency responsible for issuing permits concluded the permit renewal was exempt from CEQA under the existing facilities exemption. (*Id.* at p. 1311.) The appellate court rejected the petitioner's contentions that the absence of previous environmental review precluded application of the exemption. (See *ibid.*) The court emphasized that "the record contains no evidence of any significant change in its operations." (*Ibid.*) The same is true in the instant case.

plant is deteriorating, and to cross fingers hoping that there will not be an earthquake, even a moderate one, that could cause a reactor meltdown and radioactive release that may be unstoppable."  Speculation that disaster is more likely to occur in seven years than two is not substantial evidence nor is it a sufficient basis on which to distinguish *North Coast*.  As respondents point out, the existing facilities exemption does not include a time limit; neither does the unusual circumstances exception.

Third, appellant argues that the "gravity of the environmental harm is much greater" here than in *North Coast* and includes the deaths of billions of fish and the possibility of a radioactive plume descending to Los Angeles.  This argument is unpersuasive because the *North Coast* decision did not turn on the degree of potential harm; the court considered the "large volume of CVP water" used and the effects on fish to be "part of the existing environmental baseline" without regard to their magnitude.

Appellant also argues that we can and should "consider the increases and intensity of significant effects."  It points to *Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1196-1197 for the proposition that "nothing in the baseline concept excuses a lead agency from considering the potential environmental impacts of increases in the intensity or rate of use that may result from a project."  While this is an accurate statement of the law, it is not applicable here.  The lease replacement is intended to maintain the current status quo at the plant.  Appellant has not pointed to any evidence showing that the project will increase either the intensity or rate of use of the cooling system infrastructure.

33

Finally, appellant contends that *Citizens, supra*, 202 Cal.App.4th 549 "held that even when existing operations are being continued without change, future risks need to be considered when deciding the application of CEQA." This is incorrect. In *Citizens*, the petitioner alleged defects in an EIR prepared in connection with a 30-year lease extension for a marine oil terminal that had been operating since 1905. In the factual portion of its opinion, the appellate court noted that the Commission ordered the EIR for the preexisting oil terminal after concluding that "future oil spills constituted a potentially significant environmental impact." (*Citizens, supra*, 202 Cal.App.4th at p. 555.) Appellant asserts the Commission was obligated to take the same approach in this case. The factual recitation regarding the Commission's decision to prepare an EIR was not the holding of the case, however. "An appellate decision is not authority for everything said in the court's opinion but only 'for the points actually involved and actually decided.' [Citations.]" (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 620.)

### 2. Reasonable Possibility of Significant Effect

Appellant argues that there are numerous unusual circumstances that may have a significant effect on the environment.[10] We consider each of the claimed environmental

---

[10] Appellant additionally argues that four of these *will* have a significant effect. Our conclusion that none of the circumstances may have an effect necessarily forecloses the argument that these four—the plant's "massive size and location," "increases in cancer and infant mortality," "killing billions of fish and creating a 47 mile dead zone for marine life," and "storing thousands of spent fuel rods"—will have a significant environmental effect.

34

impacts in turn. Our inquiry is whether the Commission properly applied the "fair argument" standard. (*Berkeley Hillside, supra*, 60 Cal.4th at p. 1103.) In other words, we consider whether it erroneously ignored substantial evidence that any of the alleged unusual circumstances may have a significant environmental effect.

### a. Size

Appellant asserts that the plant's large size alone "supports a 'fair argument' that creates an exception to the exemption." It does not clarify how the plant's size—which will remain fixed after the lease replacement—is likely to cause "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project." (Guidelines § 15382.) Appellant also fails to point to any evidence in the record supporting its assertions about the size of the plant or the effect it may have. We accordingly do not find any error in the Commission's conclusion.

### b. Location

Appellant next contends that the plant's location on the Pacific coast "will have a significant effect on marine life" during the term of the lease replacement because it "is creating a coastline dead zone stretching out 46 miles and covering roughly 93 square miles." However, the evidence appellant cites discusses the plant's current impact on the environment rather than potential future effects due to the lease replacement. Indeed, appellant asserts that the plant "*is creating* a coastline dead zone." These preexisting effects are part of the baseline, and appellant has not pointed to any substantial evidence indicating that they will become worse due to the lease replacement.

35

Instead, appellant argues that the Commission "must consider the future *reasonably foreseeable probable* killing of marine life as well." Appellant relies on *Carmel River, supra*, 141 Cal.App.4th 677, which considered whether the transfer of a water credit was a project subject to the "replacement structure" categorical exemption (Guidelines § 15302), and whether the "responsible agency" (Guidelines § 15381) properly concluded that the transfer would not have direct or indirect effects on the environment (Guidelines § 15042). One of the responsible agency's internal rules—not CEQA—required it to consider the cumulative impacts of water credit transfers on the water supply. (*Carmel River, supra*, 141 Cal.App.4th at p. 701.) The appellate court considered whether the responsible agency's findings under its own rule were supported by substantial evidence and concluded they were not. (See *id.* at pp. 701, 705.) In making that finding, the appellate court observed that the Guidelines define the "cumulative impact from several projects" as "the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and *reasonably foreseeable probable* future projects." (*Id.* at p. 704; Guidelines § 15355, subd. (b), emphasis added.) This definition is not relevant here, as appellant has not pointed to any "reasonably foreseeable probable future projects" that could combine with the lease replacement and result in a significant environmental effect. To the contrary, the record clearly shows that PG&E plans to close the plant when the lease replacement expires.

### c.     Health Effects

Appellant next contends that the rates of cancer and infant mortality in the area surrounding the plant have increased since

36

the plant opened in 1985, and that "the number of victims succumbing to cancer and the number of infants that die in the first year after birth will increase further" if the lease replacement is approved.  Appellant points to the Mangano study and related presentation and asks, "What could be more significant than the loss of newborn life?"

The Mangano study does not demonstrate a causative link between the plant's operations and the observed adverse health outcomes.  At best, it concludes that "elevated radioactivity in the environment—and hence in the diet—is a factor in the rising morbidity and mortality rates in affected populations living near Diablo Canyon."  But the evidence in this case demonstrates that any such effects, if they exist, are part of the baseline conditions.  The record before the Commission  contained no substantial evidence showing whether or how the lease replacement will cause these conditions to change.

### d.     Marine Life

In an argument similar to its location argument, appellant contends it is "patently obvious" that "processing and depositing 2.5 billion gallons a day of superheated seawater back into the sea is creating a dead zone that is constantly expanding." Appellant asserts that the plant is near the habitats of at least six endangered species, that "over 45 billion fish eggs and marine larvae have died over Diablo's 32-year operational lifetime," and that "[a]nother seven years of operating Diablo will increase the number of marine organisms killed by the plant to nearly 60 billion deaths."  It further asserts that "[t]he cumulative, potentially exponential, impacts from seven more years of plant operations supports a fair argument of a significant effect supporting a comprehensive environmental review under CEQA."

37

Evidence of an "exponential" impact on surrounding marine life may well support a fair argument that the lease replacement will have a significant environmental effect. Yet appellant does not point to any such evidence in support of its sweeping claim. None of the evidence to which it points shows that the lease replacement will change or expand the plant's current marine life impacts beyond the baseline conditions. Indeed, the sole cited evidence regarding endangered species—a public comment regarding the plant's effect on marine life—does not support its assertions regarding endangered species habitats at all.

### e.    Fuel Rod Storage

Appellant contends that the lease replacement will result in spent fuel rods being added to the already large collection of radioactive waste stored at the plant. It asserts that there will be approximately 4,300 spent fuel rods stored at the plant by 2025. "Should waste not be stored adequately," appellant suggests, "radioactive substances could find their way into ground water, or contaminate other valuable resources or sites."

The baseline conditions at the plant include the storage of thousands of spent fuel rods. Appellant has not pointed to any substantial evidence supporting its speculation that the lease replacement would cause the fuel rods to be stored inadequately or otherwise increase the danger inherent in the ongoing on-site storage of nuclear waste. The record shows that the plant "has sufficient capacity to be able to take on all of the spent fuel rods that have been used so far and that will be used between now and the end of '25."

Appellant points only to data in the Mangano report showing that Diablo Canyon was among the top five U.S. nuclear power plants in emitting "selected types of radioactivity" in

38

"selected years."  Nothing connects these emissions to the storage of fuel rods.  More importantly, nothing connects them to the lease replacement, or suggests that the lease replacement will alter these historic emissions levels.

### f.  Embrittlement

At oral argument, appellant's counsel emphasized that the plant's reactor is "embrittled" and asserted that it will become more embrittled if the lease replacement moves forward, posing a danger of a nuclear meltdown.  The record contains only two mentions of embrittlement.  First, there is a written statement from S. David Freeman of Friends of the Earth, which originally was submitted to the Public Utility Commission in September 2015.  It asserts, without citing to any authority, that the plant's reactors "have an embrittlement problem" that has "weakened the structure to the point that the NRC has flagged the problem" and would require "annealing" to repair.  Second, there is a June 27, 2016 letter to the Commission from Alliance for Nuclear Responsibility attorney John L. Geesman.  That letter states, "Seismic risk is a particular concern for Diablo Canyon's Unit 1 reactor, which the Nuclear Regulatory Commission ('NRC') identified in 2013 as the third-most embrittled reactor in the United States."  That single sentence is followed by a footnote, which states, in its entirety, "http://pbadupws.nrc.gov/docs/ML1310/ML13108A336. pdf."  The document to which that link points is a fifteen-page "Summary of the March 19, 2013, Public Meeting Webinar Regarding Palisades Nuclear Plant" prepared by the NRC in April 2013.  Neither side has indicated where in the record that document can be found; our review did not locate it.

Without citation to any evidence beyond this, appellant argued orally and in its briefs that such embrittlement "threatens the integrity of the entire reactor pressure vessel, which can result in a core meltdown," and "increases the likelihood that . . . the reactor vessel, which contains the nuclear fuel rods, will rupture causing a catastrophic failure and major radiation release." Appellant asserts that, "[u]nder these circumstances, seven years is a long time to be playing Radioactive Russian Roulette."

Two mentions of the undefined term "embrittlement" do not constitute substantial evidence of the possibility of a significant environmental effect. Appellant has not pointed to any evidence before the Commission showing that the lease replacement would worsen any embrittlement or make related problems more likely. Nor has it pointed to any authority indicating that the Commission is obliged to follow a hyperlink in a comment letter to locate substantive support for a public comment. Appellant's contention that the evidence supported a fair argument accordingly must fail.

### g.    Seismic Events

Appellant next contends that the risks of seismic events such as earthquakes and tsunamis "are real and could be devastating." Appellant argues that the water intake infrastructure could be overwhelmed during a tsunami, causing a disaster akin to the meltdown of the Fukushima nuclear plant in Japan. It also argues that the plant's location near the Shoreline and Hosgri faults, as well as the conflicting opinions regarding the likelihood of those two faults rupturing simultaneously, presents a fair argument that the lease replacement will have a significant environmental effect. We disagree.

The risk of seismic events is independent of the lease replacement. There is no evidence that the lease replacement will heighten the risk beyond what it already was at the time of the Commission's decision. The earthquake specifications of the plant are not slated to change, and there is no evidence that continued operation of the cooling system will materially affect the fault lines in any way. The likelihood of a tsunami inundating the water intake system also will not be affected by the lease replacement. The conflicting opinions on the likelihood of a dual rupture of the Shoreline and Hosgri fault lines are not sufficient to demonstrate a possibility that the lease replacement will affect the seismic risk inherent at the site.

### h.    Terrorist Attacks

Pointing to the 9/11 Commission report and research from 2005, appellant contends that the plant is at risk of sustaining a terrorist attack, whether physical or cyber. Appellant speculates that terrorists could target the plant, "in an attempt to release radioactive contamination into adjacent communities." If that were to happen, appellant continues, "many nearby residents would suffer from acute radiation poisoning (short term) and cancer (long term)."

These concerns are not predicated on the lease replacement. Rather, they stem from the mere existence of radioactive materials at the plant. There is no evidence in the record that prospective terrorists will be more likely to target the plant as a result of the lease replacement, or that the lease replacement is likely to heighten the damage a terrorist attack would cause. Without some evidence connecting the lease replacement to the likelihood of an attack, appellant cannot make the requisite fair argument.

### i.    Last Remaining Nuclear Plant

Appellant  contends that the plant's status as the sole operating nuclear plant in the state itself indicates that the lease replacement will have a significant environmental effect. However, appellant acknowledges that the plant has been the sole operating plant since June 2013; the lease replacement will not change that circumstance.  The plant's status thus was part of the existing conditions at the time of the Commission's 2016 decision.

### j.    Criminal Conviction of PG&E

Appellant asserts that PG&E was prosecuted for and convicted of "safety-related and agency obstruction felony counts related to its natural gas business."  Pointing to a federal court case that does not appear to have been part of the administrative record, appellant argues that the convictions demonstrate PG&E's "careless disregard for public health and well-being" and "support[ ] a fair argument of skepticism that PG&E will safely manage Diablo without the guidance provided by CEQA review."

Appellant has not linked this *ad hominem*, extra-record attack on PG&E to the lease replacement.  Nor does it demonstrate that the convictions may have any effect on the environment surrounding the plant.  No fair argument can be made on this point.

## VI.   Public Trust Doctrine

In addition to its CEQA challenge, appellant contends the Commission violated the public trust doctrine when it approved the lease replacement.  It contends that the Commission erred "because an improper 'baseline' was applied, [and] the staff never performed the 'factual evaluation' that was necessary to make a decision on public trust."  We disagree.

The public trust doctrine has been part of California law since the state's admission to the Union in 1850. (*Citizens*, *supra*, 202 Cal.App.4th at p. 570.) At that time, the state "acquired ownership of all tidelands and the beds of all inland navigable waters within its borders." (*Ibid.*) The state now "owns these tidelands and submerged lands as trustee for public purposes, and a public easement and servitude exists over these lands for those purposes." (*Ibid.*) It has an obligation to regulate the use of these lands for the general benefit of the community. (*Ibid.*) The "'traditional triad' of public trust uses includes navigation, commerce, and fishing on navigable waters," though recreation and environmental preservation also have been recognized as valid public trust uses. (*Id.* at p. 571.) The Commission is authorized to lease public trust lands for these limited purposes.

The staff report adopted by the Commission explicitly analyzed the public trust doctrine. The report noted that the State Water Resources Control Board had adopted a new policy on once-through cooling, which would require modifications to the plant if it were to continue operating after 2025. The report concluded that the new policy "appropriately regulates" the impacts to marine life associated with once-through cooling. The report also noted that the Joint Proposal addressed "policy concerns associated with the shutdown of the DCPP in 2025, including replacement energy . . ., workforce transition, and community impacts." It ultimately concluded that the lease replacement "will not significantly interfere with the trusts upon which [public] lands are held or substantially impair the public rights to navigation, fisheries, or other Public Trust needs and values at this time, at this location, and for the

43

limited-term lease beginning June 28, 2016 and ending August 26, 2025."

"There is no set 'procedural matrix' for determining state compliance with the public trust doctrine." (*San Francisco Baykeeper, Inc. v. California State Lands Commission* (2015) 242 Cal.App.4th 202, 234.) Our review is limited to determining whether the Commission's ruling was arbitrary, capricious, or entirely lacking in evidentiary support, or whether it failed to follow appropriate procedures. (*County of Orange v. Heim* (1973) 30 Cal.App.3d 694, 718-719.) We do not reweigh the evidence, substitute our judgment for that of the Commission, or inquire into the soundness of the Commission's reasoning. (*Id.* at p. 721.) Applying this deferential review, we find no error by the Commission.

Appellant claims the Commission failed to perform a requisite "factual evaluation." Without citing any authority, it suggests a proper evaluation would have included "the cumulative environmental impacts from the continued operation of Diablo," and would have found that the lease replacement would interfere with the public interests in "waterborne commerce, fisheries, recreation and most importantly, habitat preservation." The Commission considered the facts before it, citing record evidence while balancing the public trust rights to navigation, fisheries, and environmental protection against the public need for efficient electrical production. This review was not arbitrary, capricious, or procedurally irregular. Appellant acknowledges that the public trust doctrine operates independently of CEQA; it thus is unclear why the alleged baseline error in the CEQA analysis undermines the otherwise facially adequate public trust doctrine analysis.

## DISPOSITION

The judgment of the trial court is affirmed.  Respondents are awarded their costs on appeal.

**CERTIFIED FOR PUBLICATION**


COLLINS, J.

We concur:


EPSTEIN, P. J.


WILLHITE, J.

45