Filed 6/28/23; certified for publication 7/25/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| UNITED NEIGHBORHOODS FOR LOS ANGELES,<br><br>   Plaintiff and Respondent,<br><br>   v.<br><br>CITY OF LOS ANGELES et al.,<br><br>   Defendants and Appellants;<br><br>FARIBORZ MOSHFEGH et al.,<br><br>   Real Parties in Interest and Appellants. | B321050<br><br>(Los Angeles County Super. Ct. No. 20STCP03844) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge.  Affirmed.

Office of the Los Angeles City Attorney, Michael N. Feuer, Terry P. Kauffmann Macias, and John W. Fox; Remy Moose Manley, Sabrina V. Teller and Bridget K. McDonald, for Defendants and Appellants.

Jeffer Mangles Butler & Mitchell, Matthew D. Hinks and Daniel F. Freedman, for Real Parties in Interest and Appellants.

Venskus & Associates, Sabrina Venskus and Rachael Andrews, for Plaintiff and Respondent.

_____

The City of Los Angeles (the City) approved a project at 1719-1731 North Whitley Avenue in Hollywood (the Project) that would replace 40 apartments subject to the City's rent stabilization ordinance (RSO) with a hotel. The City determined the Project was exempt from review under the California Environmental Quality Act (CEQA) pursuant to CEQA Guidelines relating to certain development projects.[1] The relevant guideline addresses what is often referred to as the "in-fill" exemption or the "Class 32" exemption.[2] We discuss the

_____

[1] CEQA is codified in Public Resources Code section 21000 et seq. All undesignated statutory references that follow are to that code.

References to the "Guidelines" that follow are to the CEQA Guidelines. (Cal. Code Regs., tit. 14, § 15000 et seq.) "In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428 fn. 5.)

[2] The Guidelines specify "classes" of projects that are categorically exempt from CEQA review. (Guidelines, § 15332 ["Class 32 consists of projects characterized as in-fill development meeting the conditions described in this section"]; *Pacific Palisades Residents Assn., Inc. v. City of Los Angeles* (2023) 88

2

exemption in detail in the Discussion section of our opinion, but among other things, the in-fill exemption requires the project to be consistent with "all applicable general plan policies." (Guidelines, § 15332, subd. (a).)

The City's review of the Project included a hearing before the Department of City Planning and appeals to the Central Area Planning Commission and City Council. Each of these bodies determined the in-fill exemption applied. Respondent United Neighborhoods for Los Angeles (United Neighborhoods) sought a writ of mandate in the Los Angeles Superior Court, arguing, among other things, that the in-fill exemption does not apply because the Project is not consistent with a General Plan policy concerning the preservation of affordable housing. The trial court

---

Cal.App.5th 1338, 1364 ["This CEQA exemption is sometimes called the in-fill development projects exemption, the Class 32 categorical exemption, or some similar combination of words"].) "In-fill" refers, both colloquially and for purposes of the Guidelines, to construction in areas that are already largely developed. (Guidelines, § 15332, subd. (b) [among other requirements, projects subject to the in-fill exemption must be "substantially surrounded by urban uses"]; Governor's Office of Planning and Research definition of "Infill Development" <https://opr.ca.gov/planning/land-use/infill-development> [as of June 27, 2023] as archived at <https://perma.cc/TFJ5-JES7> ["The term 'infill development' refers to building within unused and underutilized lands within existing development patterns, typically but not exclusively in urban areas"]; Merriam-Webster Dict. Online (2023) <https://www.merriam-webster.com/dictionary/infill> [as of June 27, 2023] as archived at <https://perma.cc/V8RN-ZCZS> [defining "infill" to include "new buildings constructed in the space available between existing structures"].)

3

granted the writ, effectively halting the Project until the City were to find the Project is consistent with that policy or 148-159 undertakes CEQA review. The City and real parties in interest appeal. We affirm the order granting the petition for writ of mandate.

## BACKGROUND

### A. The Project

Real party in interest Whitley Apartments, LLC (Whitley) owns the parcel located at 1719-1731 North Whitley Avenue in the Hollywood Community Plan Area of the City.[3] Neighboring properties include multi-family residential buildings, a parking structure, and hotel, office, and retail uses. There are currently six buildings on the approximately one half-acre site, which include 40 apartment units subject to the City's RSO.

Among other things, the RSO limits annual rent increases for an existing tenant to a percentage of the prior year's rent calculated based on the Consumer Price Index. (L.A. Mun. Code, § 151.06(D).) It also limits evictions to 14 enumerated grounds. (L.A. Mun. Code, § 151.09(A).) These include demolition of the rental unit (L.A. Mun. Code, § 151.09(A)(10)(a)), but the landlord must provide notice and compensation consistent with the Ellis Act, governing demolition or other removal of rental units from the housing market. (Gov. Code, § 7060 et seq.; L.A. Mun. Code, §§ 151.22–151.28.)

In 2016, Whitley applied for a site plan review to demolish the existing apartment buildings and construct a 156-room hotel in their place. The hotel would stand 10 stories and include three

---

[3] The other real party in interest, Fariborz Moshfegh, is the Project applicant.

4

levels of subterranean parking. In addition to guest rooms, the hotel would include various amenities available only to guests, such as a coffee shop and rooftop pool.

## B. *CEQA Exemption and Administrative Appeals*

The City approved the site plan review and determined the Project qualifies for CEQA's in-fill exemption, such that formal CEQA review did not need to be undertaken. This appeal concerns only the latter determination. Our summary of the relevant background begins with an overview of the City's General Plan because, as we shall discuss in more detail, one of the requirements of the in-fill exemption is "consisten[cy] with the applicable general plan designation and all applicable general plan policies as well as with applicable zoning designation and regulations." (Guidelines, § 15332, subd. (a).)

### 1. *Overview of relevant provisions of the General Plan*

This appeal principally involves the Framework Element and the Housing Element of the City's General Plan.[4] The

---

[4] The trial court took judicial notice of the Framework Element, the 2013-2021 Housing Element, and portions of the Association of Environmental Professionals' 2019 California Environmental Quality Act Statute and Guidelines Handbook, and so do we. (Evid. Code, §§ 452, subd. (b), 459, subd. (a).) We also grant plaintiff United Neighborhoods for Los Angeles's (United Neighborhoods') request for judicial notice of various sections of the Los Angeles Municipal Code and the Governor's Office of Planning and Research definition of "Infill Development." (Evid. Code, §§ 452, subd. (b), 459, subd. (a).) We decline United Neighborhoods' request for judicial notice of documents addressing unrelated projects, unrelated state

Framework Element explains that it "is the 'umbrella document' that provides the direction and vision necessary to bring cohesion to the City's overall general plan." "It provides a citywide context and a comprehensive long-range strategy to guide the comprehensive update of the general plan's other elements . . . ."[5]

The Housing Element is statutorily required to set forth certain assessments, goals, objectives, policies, and plans for implementation. (Gov. Code, §§ 65302, subd. (c), 65583.) The first goal identified in the City's 2013-2021 Housing Element (in effect when the Project was approved) is "[a] City where housing production and preservation result in an adequate supply of ownership and rental housing that is safe, healthy and affordable to people of all income levels, races, [and] ages, and suitable for their various needs." One of the objectives relevant to this goal is to "[p]reserve quality rental and ownership housing for households of all income levels and special needs." Policies relevant to this objective include policy 1.2.2 ("Encourage and incentivize the preservation of affordable housing, including non-subsidized affordable units, to ensure that demolitions and conversions do not result in the net loss of the City's stock of decent, safe, healthy or affordable housing") and 1.2.8 ("Preserve the existing stock of affordable housing near transit stations and

legislation, and the 2021-2029 Housing Element (which did not govern the challenged actions).

[5] The Framework Element includes a "Housing" chapter, not to be confused with the General Plan's Housing Element. The Framework Element's chapter on housing "provides guidance for the comprehensive update of the Housing Element and related implementation measures."

transit corridors. Encourage one-to-one replacement of demolished units").

In addition to the Housing Element's goals, objectives, and policies, the Housing Element also lists housing "programs"—many of which are framed at a level of generality similar to policies.[6] One such program, expressly linked to policies 1.2.2 and 1.2.8, relates to the "[p]reservation of [r]ent-[s]tabilized [h]ousing [u]nits" and has the objective of "[p]reserv[ing] more than 638,000 RSO units . . . ."

2.    *Approval by Department of City Planning*

In March 2019, the Department of City Planning noticed a public hearing regarding the site plan review and CEQA exemption and issued findings supporting a determination that the Project qualifies for the in-fill exemption. The findings discussed the General Plan's Framework Element, the Hollywood Community plan, the Hollywood Redevelopment Plan, and the Planning and Zoning Code. The findings did not expressly address the General Plan's Housing Element.

In August 2019, the Planning Director determined the in-fill exemption applies. Relevant findings addressed the Project's

---

[6]    The Housing Element explains that, "In a departure from the previous Housing Element, programs are now being separated out from specific policies . . . . This is in line with the City's new General Plan format, as the City found that having programs listed as achieving only one policy objective is too restraining when many of the City's housing programs meet the objectives of multiple policies. However, to provide some level of organization to the program list . . . , programs are listed below their most relevant objective. Specific policies that relate to the programs are listed below their program description . . . ."

7

consistency with the Hollywood Community Plan as well as the General Plan's Framework Element, Land Use Element, Mobility Element, Air Quality Element, and Sewage Facilities Element. Again, there was no express discussion of the general plan's Housing Element.

                *3.       Appeal to the Central Area Planning Commission*

United Neighborhoods appealed the Planning Director's determination to the Central Los Angeles Area Planning Commission (the Planning Commission). The document describing the basis for the appeal began with the comment that "[t]he findings contained in the determination letter are based on an incomplete and inaccurate reading of the Framework Element and the Hollywood Community Plan. The author also ignores the first goal of the City's 2013 Housing Element: [¶] *Goal 1: A City where housing production and preservation result in an adequate supply of ownership and rental housing that is safe, healthy and affordable to people of all income levels, races, ages, and suitable for their various needs.*" In a subsequent section of the document, United Neighborhoods stated that, "[w]hile it's unclear how many displaced tenants end up living on the street, we have seen the homeless population in Hollywood grow substantially larger as the [Department of City Planning] continues to approve projects which result in the removal of RSO housing. City Hall and the [Department of City Planning] have utterly failed to provide a mix of housing options for all income levels as required by the City's General Plan and State law." The appeal proceeded to discuss these issues in relation to the General Plan's Framework

8

Element, the Hollywood Community Plan, and the Hollywood Redevelopment Plan.[7]

In a supplemental letter, United Neighborhoods "clarif[ied] for the record that [it was] appealing both the approval of the site plan review and the approval of the CEQA exemption . . . ." The letter further emphasized that, "[b]y exempting the Project from CEQA, the City has completely failed to disclose, analyze, and mitigate the Project's significant direct and cumulative effects on the environment caused by permanently eliminating 40 rent-stabilized housing units, as well as the substantial direct and cumulative adverse effects on the human beings who will be displaced from their homes."

The Los Angeles Tenants Union (LATU) also filed an appeal with the Planning Commission raising issues similar to those raised by United Neighborhoods, including the preservation of RSO units. LATU's appeal focused on the Project's consistency with the Hollywood Community Plan, the Residential Hotel Ordinance, and various proposed planning documents and ordinances.

The Department of City Planning prepared a report for the Planning Commission's consideration of United Neighborhoods and LATU's appeals. The report paraphrased United Neighborhoods' appeal as contending, in part, that "[t]he removal of 40 units which are subject to the Rent Stabilization Ordinance conflicts with the Framework and Housing Elements and the

---

[7] United Neighborhoods also discussed the Project's potential impacts on air quality, cultural resources, noise, public services, traffic, and utilities. These issues are not pertinent to this appeal.

9

Hollywood Community Plan . . . ."  The report analyzed this argument only in the context of the site plan review—as opposed to the in-fill exemption to CEQA—and emphasized the Project need not "be in conformance with <u>all</u> purposes, intent and provisions of the General Plan," but "more generally 'in substantial conformance' with the General Plan . . . ." Emphasizing the Project's location within a "[r]egional [c]enter" pursuant to the Hollywood Community Plan,[8] the report suggested "that while the proposed project may not be in conformance with <u>all</u> purposes, intent and provisions of the . . . General Plan and Hollywood Community Plan, the project [is] in <u>substantial conformance</u> with the General Plan and Hollywood Community Plan."

Beneath a separate heading addressing the in-fill exemption to CEQA, the report noted United Neighborhoods' position that "[t]he [P]roject would . . . result in a significant impact on . . . population and housing."  The report stated that, "[a]s the proposed project qualifies for the [in-fill exemption] it is exempt from CEQA.  As it relates to population and housing,

---

[8]     The Framework Element explains that regional centers "serve as the focal points of regional commerce, identity, and activity for a population of 250,000 to 500,000 persons. Generally, they include corporate professional offices, concentrations of entertainment and cultural facilities, and mixed-use developments.  Some contain region-serving retail facilities.  Typically, [r]egional [c]enters are higher-density places whose physical form is substantially differentiated from the lower-density neighborhoods of the City. . . .  This category is generally characterized by six- to twenty-story buildings or higher. . . ."

10

were the project not to be exempt from CEQA, analysis of the project's impact to population and housing would be proper. The City's determination that the project qualifies for the [in-fill exemption] is based on [specified sections] of the CEQA Guidelines, and [is] not . . . an effort to avoid any particular area of impact analysis."

In its discussion of LATU's contention that the in-fill exemption does not apply because the Project conflicts with the Hollywood Community Plan's objective to provide housing for all economic segments, the report explained that "[t]he project is not a housing project, and therefore is not expected to provide housing to satisfy the needs and desires of all economic segments of the Community. In addition, while the project would result in the removal of 40 units, the removal of such units does not conflict with the City's ability to provide housing to all economic segments of the Community."

Prior to the Planning Commission's hearing on the appeals, several members of the public submitted comments objecting to the proposed replacement of RSO housing with a hotel.[9]

---

[9]     For example, one commenter argued "[t]he Project's removal of vital rent-controlled dwelling units is inconsistent with applicable land use goals/policies." Another opined that the "proposed 10-story luxury party hotel . . . , which would demolish forty units of rent-controlled housing," would cause more homelessness. Another argued that "[t]he loss of affordable housing and the strain on our community members who live in the apartments is not worth it" and urged the Commission, "[a]t the very least," to "require the developers to conduct a full EIR and assess the impact the proposed hotel would have on the residents . . . ."

11

Although one of the planning commissioners lamented that approving such projects "almost incentiviz[es] removing housing for hotel uses" and "we couldn't even rebuild this type of apartment building elsewhere" due to parking requirements, all three members of the Planning Commission present at the hearing voted to deny the appeals and adopt the Planning Director's findings.

### 4. Appeal to the City Council

Both United Neighborhoods and LATU appealed the Planning Commission's denial of their appeals to the City Council. In addition to discussing the Project's possible environmental impacts, United Neighborhoods' appeal emphasized that "City Hall and the [Department of City Planning] have utterly failed to provide a mix of housing options for all income levels as required by the City's General Plan and State law."

The City Council referred the appeals to its Planning and Land Use Management Committee to conduct a hearing. Members of the public again commented on the loss of affordable housing. A representative of United Neighborhoods submitted a comment contending "the City's approval of the site plan review ignored the fact that the Project does not comply with either the Housing Element of the General Plan or the Hollywood Community Plan. By removing 40 rent-stabilized units at a time when the Mayor and the City Council have repeatedly stated that the City is experiencing a housing crisis, it should be crystal clear that the Project frustrates the goal of providing housing for Angelenos at all income levels, which is stated in both the Housing Element and the Hollywood Community Plan."

Following a public hearing, the Planning and Land Use Management Committee recommended the City Council deny the appeals. The City Council adopted the committee's recommendation, denying the appeals, determining the in-fill exemption applies, and adopting the Planning Commission's findings (i.e., the Planning Director's findings adopted by the Planning Commission) as its own. The City subsequently filed a notice of exemption for the Project stating the in-fill exemption applies because, among other things, "[t]he project is consistent with the applicable general plan designation and all applicable general plan policies as well as with the applicable zoning designation and regulations."

C.    *Petition for Writ of Mandate*

United Neighborhoods filed a petition for writ of mandate arguing, among other things, that the City abused its discretion in approving the Project under the in-fill exemption.[10]  In its opening brief, United Neighborhoods contended the City "blatantly and impermissibly ignore[d]" applicable Housing Element policies, the City did not fully consider applicable Framework Element policies, and unusual circumstances gave rise to an exception to the in-fill exemption. With respect to the first issue, United Neighborhoods cited the Housing Element's first goal relating to production and preservation of affordable housing and specific policies in furtherance of that goal. The City responded that Housing Element policies concerning affordable housing do not apply because the Project is not a *housing* project

---

[10]    LATU did not file a mandate petition with the trial court and is not a party to this appeal.

13

and because RSO housing is not necessarily affordable housing.[11] During the hearing on the petition, the City further argued that United Neighborhoods had failed to raise consistency with the Housing Element in the administrative proceedings.

The trial court granted the petition for a writ of mandate based on the City's failure to consider the Project's consistency with applicable Housing Element policies.[12] As to the City's argument that United Neighborhoods did not exhaust its administrative remedies, the trial court found United Neighborhoods "sufficiently raised the issue" by "advis[ing] the City the findings in the [Planning Director's] letter of determination were 'incomplete' and 'ignore[d] the first goal of the City's 2013 Housing Element.' " The trial court emphasized that the City "[did] not in any manner address the . . . Housing Element or explain its inapplicability beyond the Project's label— a hotel." Accordingly, the issue was not "how the City exercised its discretion and balanced competing policies and concerns," but "whether the City even considered the . . . Housing Element and how those policies might be balanced against other General Plan policies." Because "the City did not consider its Housing

---

[11] The City and Whitley filed a joint opposition brief, just as they have filed joint briefs on appeal. We refer to the City and Whitley collectively as the City.

[12] As to United Neighborhoods' other arguments, the trial court determined substantial evidence supported the City's determination that the Project is consistent with Framework Element policies and United Neighborhoods did not meet its burden of demonstrating that unusual circumstances warranted an exception to the in-fill exemption.

14

Element, the City could not have decided other competing General Plan policies took priority over those (not considered) Housing Element policies."

After issuing the order granting United Neighborhoods' petition, the trial court entered judgment and issued a peremptory writ of mandate directing the City to set aside its exemption determination and Project approval.

The City appealed both the order granting the petition and the judgment. We consolidated the two appeals and now resolve them in this opinion.

## DISCUSSION

### A. Summary

At the heart of this appeal is whether the City was required to have considered certain parts of the Housing Element of the General Plan. The Housing Element contains policies calling for the preservation of affordable housing, including "to ensure that demolitions and conversions do not result in the net loss of the City's stock of decent, safe, healthy or affordable housing." Because CEQA's in-fill exemption requires consistency with "all applicable general plan policies" (Guidelines, § 15332, subd. (a)), the City's approval must be based on a determination that the Project is consistent with such policies or the policies do not apply.

At the outset, the City argues that United Neighborhoods did not adequately argue in the administrative proceedings that the Project was inconsistent with Housing Element policies relating to the preservation of affordable housing. Although United Neighborhoods did not identify the policies by number, the City expressly acknowledged its objection that demolishing RSO housing units would conflict with the Housing Element.

15

Under these circumstances, the City was fairly apprised of the relevant issues to satisfy the exhaustion requirement.

As to the merits, the City contends the City Council made an implied finding that Housing Element policies do not apply to the Project.  This finding is not supported by substantial evidence.  The City's suggestion that "affordable housing" does not include RSO housing for purposes of the Housing Element conflicts with the ordinary meaning of that phrase, and the City's position that the Housing Element is focused solely on the *production* of new housing cannot be reconciled with express references to the *preservation* of affordable housing.  The City's alternative contention that the trial court was insufficiently deferential to its determination that the Project is consistent with Housing Element policies fails because there is no indication the City actually considered these policies.

**B.** **Legal Framework**

" 'The basic purposes of CEQA are to:  [¶]  (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities.  [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced.  [¶]  (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible.  [¶] (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental effects are involved.'  ([Guidelines], § 15002.)" (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285–286 (*Tomlinson*).)

16

If a proposed activity qualifies as a "project" for purposes of CEQA,[13] "[t]he public agency must . . . decide whether it is exempt from compliance with CEQA under either a statutory exemption [citation] or a categorical exemption set forth in the regulations [citations]." (*Tomlinson*, *supra*, 54 Cal.4th at p. 286.) Section 21084 mandates that the Guidelines "shall include a list of classes of projects that have been determined not to have a significant effect on the environment . . . ." (§ 21084, subd. (a).) The Guidelines include 33 such categorical exemptions.[14] (Guidelines, §§ 15301-15033.) "A categorically exempt project is not subject to CEQA, and no further environmental review is required. [Citations.]" (*Tomlinson*, *supra*, at p. 286.)

The in-fill exemption is set forth in Guidelines section 15332. It exempts "projects characterized as in-fill development meeting the conditions described in this section. [¶] (a) The project is consistent with the applicable general plan designation and all applicable general plan policies as well as with applicable zoning designation and regulations. [¶] (b) The proposed development occurs within city limits on a project site of no more than five acres substantially surrounded by urban uses. [¶]

---

[13] A project is "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment" undertaken, supported, or approved by a public agency. (§ 21065.) The City does not contest that the hotel construction is a project under the statute.

[14] The Guidelines also set forth various exceptions to the exemptions, none of which are pertinent to this appeal. (Guidelines, § 15300.2.)

17

(c) The project site has no value, as habitat for endangered, rare or threatened species.  [¶]  (d) Approval of the project would not result in any significant effects relating to traffic, noise, air quality, or water quality.  [¶]  (e) The site can be adequately served by all required utilities and public services."  (Guidelines, § 15332.)

"A public agency's 'determination that [a particular] project [is] exempt from compliance with CEQA requirements . . . is subject to judicial review under the abuse of discretion standard in . . . section 21168.5.  [Citations.] . . .  Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence. . . .' "  (*Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 410 (*Holden*).)  Where, as here, the challenge concerns "a factual determination that a project falls within a statutory or categorical exemption," we review the administrative record for substantial evidence to support that decision.  (*Ibid.*)  In the context of the first element of the in-fill exemption, we consider " ' "whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies." ' [Citation.]"  (*Id.* at p. 412.)  As a general matter, the public agency bears the burden to demonstrate its exemption determination is supported by substantial evidence.  (*Citizens for Environmental Responsibility v. State ex rel. 14th Dist. Ag. Assn.* (2015) 242 Cal.App.4th 555, 568.)  However, "the party challenging a public agency's determination of general plan consistency has the burden to show why that determination is unreasonable."  (*Holden*, *supra*, at p. 413.)

"In considering a petition for a writ of mandate in a CEQA case, '[o]ur task on appeal is "the same as the trial court's."

18

[Citation.]  Thus, we conduct our review independent of the trial court's findings.'  [Citation.]  Accordingly, we examine the City's decision, not the trial court's."  (*Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 257.)

### C.  *United Neighborhoods Exhausted Its Administrative Remedies*

Before turning to the merits of whether the project is entitled to in-fill status, we discuss what we might call dueling failure-to-exhaust arguments in proceedings leading up to this appeal.  First, the City contends that United Neighborhoods may not challenge any failure by the City to consider the Housing Element because United Neighborhoods did not raise that issue in the administrative proceedings.  United Neighborhood rejoins that the City cannot raise the failure to exhaust administrative remedies because the City did not make *that* argument in the trial court.  We will assume for purposes of discussion that the issue was properly before the trial court, and we address, instead, whether United Neighborhoods raised its Housing Element point in the administrative proceedings.[15]

---

[15]    The City's contention that a public agency cannot waive the issue of exhaustion because it is "jurisdictional" is incorrect. (*Azusa Land Reclamation Co. v. Main San Gabriel Basin Wastewater* (1997) 52 Cal.App.4th 1165, 1216 [explaining that "the failure to exhaust does not deprive a court of subject matter jurisdiction," cases describing "the [exhaustion] requirement as 'jurisdictional' simply stand for the unremarkable proposition that the court does not have the discretion to refuse to apply the doctrine in cases where it applies," and "[a]n agency therefore may waive the defense"].)

Section 21177 provides that, in order to contest a decision that is subject to CEQA, "the alleged grounds for noncompliance . . . [must have been] presented to the public agency orally or in writing by any person," and the person or entity attacking the decision must have raised *some* objection during the administrative proceedings. (§ 21177, subds. (a)-(b).) The exhaustion requirement set forth in section 21177 "applies to a public agency's decision that a proposed project is categorically exempt from CEQA compliance" where, as here, "the public agency [gave] notice of the ground for its exemption determination, and that determination [was] preceded by public hearings at which members of the public had the opportunity to raise any concerns or objections to the proposed project." (*Tomlinson*, *supra*, 54 Cal.4th at p. 291.)

Although "[t]he 'exact issue' must have been presented to the administrative agency to satisfy the exhaustion requirement[,] . . . 'less specificity is required to preserve an issue for appeal in an administrative proceeding than in a judicial proceeding' because . . . parties in such proceedings generally are not represented by counsel."[16] (*Mani Brothers Real Estate Group*

---

[16] It has been suggested that the presence or absence of counsel does not alone determine the degree of specificity required to preserve an issue in administrative proceedings. For instance, in *Santa Clarita Organization for Planning the Environment v. City of Santa Clarita* (2011) 197 Cal.App.4th 1042, the Court of Appeal "question[ed] whether a rule protecting individuals who are not well versed in the technicalities of administrative proceedings [was] properly applicable to" an organization that touted its previous successful challenges to the defendant city's land use decisions. (*Id.* at p. 1051; but see *id.* at p. 1052 ["declin[ing] to depart from precedent" "[d]espite these

*v. City of Los Angeles* (2007) 153 Cal.App.4th 1385, 1394–1395.) That said, " ' " ' "bland and general references to environmental matters" ' " ' or ' " ' "isolated and unelaborated" ' " ' comments do not satisfy the exhaustion requirement . . . . [Citations.]" (*Save the Hill Group v. City of Livermore* (2022) 76 Cal.App.5th 1092, 1105 (*Save the Hill*).) Because the purpose of the exhaustion requirement " 'is that the public agency should have the opportunity to receive and respond to articulated factual issues and legal theories before its actions are subjected to judicial review,' " objections must " ' "fairly appris[e]" ' " the public agency of relevant issues to satisfy the exhaustion requirement. (*Ibid.*; accord *North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 623; *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 536 [" ' "[T]he objections must be sufficiently specific so that the agency has the opportunity to evaluate and respond to them" ' "].)

Here, in addition to the numerous comments generally opposing the demolition of RSO housing units, United Neighborhoods expressly tied this issue to the Housing Element at least twice in the administrative proceedings. First, in its appeal to the Planning Commission, United Neighborhoods argued the Planning Director's findings "ignore[d] the first goal of the City's 2013 Housing Element." Later, in a comment submitted to the City Council's Planning and Land Use Committee, a representative of United Neighborhoods argued "it

reservations"].) The City's emphasis of United Neighborhoods' participation in *this case* and allegations in the petition concerning United Neighborhoods' far-reaching ambitions does not establish a track record warranting such reservations.

should be crystal clear that the Project frustrates the goal of providing housing for Angelenos at all income levels, which is stated in both the Housing Element and the Hollywood Community Plan."

United Neighborhoods' invocation of the first goal of the Housing Element while objecting to the demolition of RSO housing was sufficient to apprise the City of the issues raised in this litigation. (*Save the Hill*, *supra*, 76 Cal.App.5th at pp. 1106–1107 [holding that, although the petitioner challenging adequacy of a city's no-project alternative analysis for housing development did not specifically refer to the analysis in administrative proceedings, comments proposing reasons and means to preserve the relevant site as open space "sufficed to fairly apprise the [c]ity of [the petitioner's] position"].)

The City contends United Neighborhoods' references to Housing Element *goals* were not sufficient to apprise it of United Neighborhoods' objection that the Project is inconsistent with Housing Element *policies*. But this argument disingenuously ignores the relationship between the Housing Element's goals and its policies. As explained in the Framework Element, "[f]or the purpose of the Los Angeles City General Plan, a goal is a direction setter . . . . An objective is a specific end that is an achievable intermediate step toward achieving a goal. A policy is a statement that guides decision making, based on the plan's goals and objectives."[17] In other words, the General Plan is

---

[17] The Housing Element offers a similar explanation framed in terms of its goals, objectives, and policies: "The objectives under each goal further speak to the nuances of housing needs across a city as diverse in population and housing needs as Los Angeles. The corresponding policies formulate the City's housing

structured such that a project that is inconsistent with Housing Element goals will necessarily conflict with more concrete Housing Element policies.

The City next argues the "breadth" of the Housing Element's first goal ("[four] objectives and 22 policies") made it impossible to determine which policies United Neighborhoods' objection implicated. But this framing obscures the fact that the first goal's objectives and policies span a grand total of two and a half pages. And United Neighborhoods' objection made clear—if it was not already clear from the nature of the Project—that it was concerned with the handful of Housing Element policies relating to the preservation (as opposed to the *production*) of affordable housing. Indeed, in its report addressing United Neighborhoods' appeal to the Planning Commission, the Department of City Planning correctly noted United Neighborhoods' position that "[t]he removal of 40 units which are subject to the Rent Stabilization Ordinance conflicts with the Framework and Housing Elements and [the] Hollywood Community Plan . . . ." The City's discussion of United Neighborhoods' contentions in the administrative proceedings demonstrates that references to the Housing Element went well beyond "generalized environmental comments." (*Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1197.)

---

approach of creating sustainable mixed-use, mixed-income neighborhoods strategically located across the City that provide opportunities for housing, jobs, transit and basic amenities for all segments of the population."

**D.** *The City Failed to Consider Applicable Housing Element Policies*

    *1.* *Substantial evidence does not support the City's determination that Housing Element policies are inapplicable*

The City contends it impliedly determined Housing Element policies are not applicable to the Project. The City correctly points out that no formal, written findings were required to document this determination. (*World Business Academy v. State Lands Com.* (2018) 24 Cal.App.5th 476, 496 (*World Business Academy*) [findings " 'can be informal so long as they serve the purposes of enabling the parties to determine whether and on what basis to appeal and enabling a reviewing court to determine the basis for the decision' "]; *San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1385 ["there is no requirement that the agency put its exemption decision in writing"]; see also *Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 388 ["Evidence appropriate to the CEQA stage in issue is all that is required" to support determination that Guidelines section 15061, subdivision (b)(3) "commonsense" exemption applies].)

Presence of documentation aside, the City's applicability finding must be supported by substantial evidence. The City does not argue to the contrary. On appeal, the City contends Housing Element policies relating to the preservation of affordable housing do not apply to the Project for two primary reasons: (1) the construction of a hotel does not bear on housing production and (2) RSO housing is not "affordable" housing

24

within the meaning of pertinent Housing Element policies. Neither argument has merit.

The only conceivable rationale found in the administrative record that would support a conclusion that Housing Element policies are inapplicable to the Project is that the Project is "not a housing project, and therefore is not expected to satisfy the needs and desires of all economic segments of the Community." We first observe that the City is referring to the Hollywood Community Plan, not the Housing Element.) More fundamentally the statement mischaracterizes both the Project and applicable Housing Element policies. To say that the Project, which requires the demolition of 40 RSO housing units, is not a housing "project" says nothing about its impact on housing. And the suggestion that the Housing Element is only concerned with the production of new housing is contrary to the Housing Element's first goal ("production *and preservation*," emphasis added), objective 1.2 ("[p]reserve quality rental and ownership housing"), and policy 1.2.2 ("[e]ncourage and incentivize the preservation of affordable housing"). Housing Element programs also underscore the emphasis on preservation.

The City makes no attempt to address these parts of the Housing Element in arguing that it "focuses only" on the production of new housing, relying instead on a line from the Framework Element discussing a previous version of the Housing Element.[18] Although the City also cites portions of the 2013-2021

---

[18] The page of the Framework Element the City cites explains that "[t]he Framework Element provides policy to further goals stated in the recently adopted Housing Element (November 1993)

Housing Element's "Housing Needs Assessment" chapter to support its argument, nothing in these pages suggests housing production is the sole focus of the Housing Element or that goals, objectives, and policies relating to preservation are to be ignored.

The City's citations to case law on this issue are uniformly unhelpful. Contrary to the City's truncated quotation from *California Building Industry Assn. v. City of San Jose* (2015) 61 Cal.4th 435, it is not true that the "statewide Housing Element Law places responsibility upon a city to use its powers to facilitate the development of housing" to the exclusion of other goals—rather, the City must "use its powers to facilitate the development of housing *that makes adequate provision for all economic segments of the community . . . ."* (*Id.* at p. 446.) The City's citation of *Association for Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720 for the proposition that our review must "focus upon the 'activity which is being approved' and not each separate governmental approval[]" (*id.* at p. 731) does not, as the City suggests, mean our review only encompasses construction activity. In context, the quoted language stands only for the unremarkable principle that a city's "cho[ice] to combine approval processes for the site development permit and the categorical exemption in a public hearing" does not alter the standard of review as to the latter decision. (*Id.* at p. 731.)

The City's alternative contention that "affordable housing" is a term of art that excludes RSO housing fails because nothing in the Housing Element suggests its use of the phrase diverges

incorporated herein by reference." The 2013-2021 Housing Element controls in this case.

26

from the ordinary meaning.[19]  The first goal, for instance, discusses the production and preservation of affordable housing in the same breath as other generic adjectives, including "safe" and "healthy."  It is a fundamental canon of statutory construction that words are to be given their ordinary meaning unless otherwise indicated.  (*Welch v. Welch* (2022) 79 Cal.App.5th 283, 296 [" ' " 'To ascertain [legislative] intent, courts turn first to the words of the statute itself [citation], and seek to give the words employed by the Legislature their usual and ordinary meaning' " ' "].)  Accordingly, we construe the Housing Element's references to affordable housing to mean "housing that can be afforded by those on low or median incomes; *spec.* housing made available to those on lower incomes at a price

---

[19]  The City's citation of portions of the Los Angeles Municipal Code and California Code of Regulations for definitions of "affordable housing" sheds no light on the meaning of this phrase within the Housing Element.  Several of the cited sections expressly limit the scope of their applicability, and none purports to define the concept so broadly as to guide our construction of the General Plan.  (L.A. Mun. Code, §§ 151.02 ["The following words and phrases, whenever used in this chapter, shall be construed as defined in this section"], 11.5.11 [discussing affordable housing requirement for projects to qualify for amendment to General Plan or allowance under otherwise-applicable zoning rules], 47.73 [defining "Affordable Housing Project" and "Affordable Housing Trust Fund" for purposes of the Residential Hotel Unit Conversion and Demolition Ordinance]; Cal. Code Regs., tit. 25, §§ 6910, 6922 [defining "[a]ffordable rent" for purposes of specified programs].)  Moreover, the multiplicity of technical definitions itself counsels against inferring that the Housing Element silently incorporates any one of them.

below normal market value, as the result of legislation or subsidy by a local authority or the state." (Oxford English Dict. Online (2023) <https://www.oed.com/view/Entry/3484?redirectedFrom= affordable#eid> [as of Apr. 10, 2023] archived as <https://perma.cc/E8WJ-ZXTE>; *Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121–1122 ["When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word"].) Because the RSO prohibits landlords from raising rents to reflect "normal market value" under certain circumstances, RSO housing units are affordable housing within the ordinary meaning of the phrase.

The City contends the foregoing analysis must be undertaken with deference to its weighing of competing interests enshrined in the General Plan. As we shall discuss, the City is correct that such deference is required with respect to a *consistency* analysis that weighs applicable policies. (*Holden*, *supra*, 43 Cal.App.5th at p. 412 ["We give great deference to a public agency's finding of consistency with its own general plan" because " 'policies in a general plan reflect a range of competing interests, [and] the governmental agency must be allowed to weigh and balance the plan's policies when applying them' "].)

No such deference is warranted, however, with respect to the City's determination of which policies apply to the Project. The principle that the City is uniquely positioned to weigh the priority of competing policies does not extend to the question of which policies are to be placed on the scales. (*Holden*, *supra*, 43 Cal.App.5th at p. 412) [" 'A reviewing court's role "is simply to decide *whether the city officials considered the applicable policies* and the extent to which the proposed project conforms with those

policies" ' "], emphasis added.) Accordingly, the City's suggestion that the trial court improperly "substituted its own judgments for those of the City" in finding which Housing Element policies are applicable to the Project is flawed to the extent that it conflates judicial review of what policies are applicable and the weight to be given various policies.

2. *The City did not consider the Project's consistency with applicable Housing Element policies*

"A project is consistent with a general plan if it will further the objectives and policies of the general plan and not obstruct their attainment. [Citation.]" (*Holden, supra*, 43 Cal.App.5th at pp. 411–412.) As we have already mentioned, our review of an agency's consistency finding is deferential. (*Id.* at p. 412.) Because a general plan " 'balance[s] a range of competing interests[,] [i]t follows that it is nearly, if not absolutely, impossible for a project to be in perfect conformity with each and every policy set forth in the applicable plan.' . . . [Citation.]" (*Ibid.*) An agency's weighing of such interests will be reversed " 'only if it is based on evidence from which no reasonable person could have reached the same conclusion,' " and the party challenging the consistency finding "has the burden to show why that determination is unreasonable." (*Id.* at pp. 412–413.) These principles only come into play, however, when the agency has in fact considered the applicable policies. (*Id.* at p. 412.)

Here, the City takes conflicting positions as to whether it found the Project to be consistent with Housing Element policies or whether its analysis ended with a determination that the policies do not apply. For instance, in its opening brief, the City suggests "[s]ubstantial evidence . . . demonstrates the City

29

implicitly concluded that the Project would not frustrate the Housing Element." In its reply brief, however, the City emphasizes that "whether the Project is *consistent* with the Housing Element is an entirely *separate* inquiry from whether its policies are even *applicable* to the Project *in the first place*" and explains that "[w]hen the City expressly concluded the Housing Element's policies did *not* apply to the Project, its analysis ended there; it did not need to redundantly engage in a subsequent, unnecessary consistency analysis with inapplicable policies." The City's position in the reply brief more accurately reflects the administrative record.

Although an agency need not make an express consistency finding (*Holden*, *supra*, 43 Cal.App.5th at pp. 416–417), there must be some indication that the agency actually considered applicable policies. (*Id.* at p. 412; *World Business Academy*, *supra*, 24 Cal.App.5th at p. 496 [holding that the record relevant to a categorical exception determination must at least be sufficient to "enabl[e] a reviewing court to determine the basis for the decision"].) Here, the City suggests we can infer that it considered the Project's consistency with Housing Element policies from its express discussion of other policies, such as those included in the Framework Element and the Hollywood Community Plan.

The City's reliance on the discussion of the Framework Element in the Department of City Planning's site plan review findings to show that it considered applicable Housing Element policies is misplaced – the discussion does not mention affordable housing. The City's suggestion that the Project's consistency with the Framework Element implies consistency "with the entirety of the General Plan" because of the Framework

30

Element's foundational role assumes, contrary to authority, the Framework Element stands in perfect harmony with the General Plan. (*Holden*, *supra*, 43 Cal.App.5th at p. 412 [emphasizing that " 'policies in a general plan reflect a range of competing interests' "].) Further, it ignores the in-fill exemption's requirement of consistency with "*all* applicable general plan policies." (Guidelines, § 15332, subd. (a), emphasis added.)

Reports stating the Project would "not conflict with the City's ability to provide housing to all economic segments of the Community" likewise have no bearing on applicable Housing Element policies. These statements address an objective of the Hollywood Community Plan calling for the City, among other things, to "make provision for the housing required to satisfy the varying needs and desires of all economic segments of the Community." This objective is less specific than the Housing Element policies that call for the preservation of affordable housing. A project, which may be consistent with the Hollywood Community Plan based on the prospective construction of new affordable housing elsewhere, will not necessarily be consistent with the Housing Element if it results in the loss of existing affordable housing.

In addition to arguing that discussion of other policies may serves as a proxy for considering applicable Housing Element policies, the City contends that conditioning approval of the Project on Ellis Act compliance indicates it considered applicable Housing Element policies.[20] The City reasons that because

---

[20] As pertinent here, and subject to certain exceptions, the Ellis Act prohibits public entities from "compel[ling] the owner of any residential real property to offer, or to continue to offer, accommodations in the property for rent or lease . . . ." (Gov.

certain provisions of the Housing Element "call[ ] for Ellis Act enforcement," such conditions must reflect the City's consideration of each and every policy included in the Housing Element.  Even if this argument made sense at an abstract level – it does not – the conditions of approval make clear that the Ellis Act condition is derived from the Los Angeles Municipal Code: "Owner shall comply with [Los Angeles Municipal Code] [s]ections 151.22 through 151.28, and any other applicable state or local law, by providing all existing units proposed to be demolished with relocation assistance, notice, and fees consistent with the Relocation Assistance Amounts as specified by law and/or the Los Angeles Housing & Community Investment Department . . . ."  The reference to the "Ellis Act" and therefore to the Municipal Code does not demonstrate the City's consideration of the General Plan's Housing Element.

Although we affirm the trial court, we do not suggest that the City was necessarily required to make formal findings that Housing Element policies are outweighed by competing policies favoring the Project.  Nor do we hold that such a decision would necessarily conflict with the General Plan.  Rather, we affirm the trial court's judgment because we cannot defer to the City's "weigh[ing] and balanc[ing] [of] the [General] [P]lan's policies" where there is no indication the City weighed and balanced all applicable policies.  (*Holden*, *supra*, 43 Cal.App.5th at p. 412.)

---

Code, § 7060, subd. (a).)  However, it expressly permits public entities to adopt measures "to mitigate any adverse impact on persons displaced by reason of the withdrawal from rent or lease of any accommodations."  (Gov. Code, § 7060.1, subd. (c).)  As we discuss, the Los Angeles Municipal Code includes several such provisions.

### *DISPOSITION*

The judgment is affirmed.  United Neighborhoods shall recover its costs on appeal.


                                    RUBIN, P. J.

WE CONCUR:



MOOR, J.



KIM, J.

33

Filed 7/25/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| UNITED NEIGHBORHOODS FOR LOS ANGELES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CITY OF LOS ANGELES et al., <br><br> Defendants and Appellants; <br><br> FARIBORZ MOSHFEGH et al., <br><br> Real Parties in Interest and Appellants. | B321050 <br><br> (Los Angeles County Super. Ct. No. 20STCP03844) <br><br><br> **ORDER FOR PUBLICATION** |

THE COURT:

IT IS HEREBY ORDERED that the opinion filed in the above matter on June 28, 2023, is certified for publication with no change in judgment.

_____

RUBIN, P. J.                      MOOR, J.                      KIM, J.