Filed 8/13/25  Friends & Families for MOVE Culver City v. City of Culver City CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| FRIENDS AND FAMILIES FOR MOVE CULVER CITY,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF CULVER CITY et al.,<br><br>Defendants and Respondents. | B342399<br><br>(Los Angeles County Super. Ct. No. 23STCP03833) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard L. Fruin, Jr., Judge.  Affirmed.

Hanson Bridgett, Ellis F. Raskin and Jillian Ames for Plaintiff and Appellant.

Heather Baker, City Attorney, Christina Burrows, Assistant City Attorney, Michael Cobden, Deputy City Attorney, for Defendants and Respondents.

# I.    INTRODUCTION

Plaintiff Friends and Families for MOVE Culver City appeals from a judgment denying its petition for writ of mandate under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.).[1]  Plaintiff contended that defendant City of Culver City (the City) violated CEQA when it approved the redesignation of a bus lane to its prior use as a general vehicle lane, and the redesignation of a bicycle lane to a shared bus/bicycle lane, without preparing an environmental impact report under CEQA.  The trial court denied the petition, finding, among other things, that the City's claimed categorical exemption to CEQA under California Code of Regulations, title 14, section 15301, subdivision (c), part of the CEQA Guidelines, applied.[2]  The court further found that plaintiff failed to demonstrate an exception to the exemption.  Plaintiff contends the trial court erred.  We affirm.

---

[1]    Further statutory references are to the Public Resources Code unless otherwise indicated.

[2]    "The term 'CEQA Guidelines' refers to the regulations for the implementation of CEQA authorized by the Legislature (. . . § 21083), codified in title 14, section 15000 et seq. of the California Code of Regulations, and 'prescribed by the Secretary [of Natural] Resources [Agency] to be followed by all state and local agencies in California in the implementation of [CEQA].' (CEQA Guidelines, § 15000.)  In interpreting CEQA, we accord the CEQA Guidelines great weight except where they are clearly unauthorized or erroneous.  [Citation.]" (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380, fn. 2.)

## II.    BACKGROUND

A.    *The Original Project*

The challenged project is to a portion of a 1.3 mile stretch of Culver Boulevard and Washington Boulevard, between Culver Boulevard at Duquesne Avenue and Washington Boulevard at La Cienega Avenue in the City (the Corridor).[3]  Prior to March 2020, the Corridor had two lanes of traffic in each direction and no dedicated bus or bicycle lanes.

On February 1, 2021, in response to changed traffic use during the COVID-19 pandemic, the City Council approved the "MOVE Culver City Tactical Mobility Lane Pilot Project" (the Original Project).  The Original Project "included separate protected bus and bike lanes where space allowed and shared bus/bike lanes where space was constrained."  The Original Project, as described by the City, was a "quick-build implementation pilot" for which "no major construction [was] anticipated beyond striping, plastic bollards, paint, and selective signal upgrades."

The City completed construction of the Original Project in November 2021.  The completed project included "one dedicated bus lane and one dedicated bicycle lane in each direction on Culver Boulevard between Duquesne Avenue and Canfield Avenue and on Washington Boulevard between Robertson Boulevard and Helms Avenue, and one general vehicle lane and one shared bus/bicycle lane in each direction on Washington Boulevard between Ince Boulevard and Robertson Boulevard and

---

[3]    Washington Boulevard turns into Culver Boulevard at around Ince Boulevard.

on Washington Boulevard between Helms Avenue and La Cienega Avenue."

B. *The Modified Project*

Beginning in January 2022, the "project team" collected data for one year "on the project's impact to vehicle, bike, and pedestrian traffic, transit ridership, business revenues, and other metrics." In March 2023, the City conducted a survey of the City's residents regarding the Original Project, which "suggest[ed] that a majority of residents want the project to continue, with most of those calling for changes to address areas of concern."

At an April 24, 2023, City Council meeting, the City directed its staff to continue the Original Project with certain modifications (Modified Project) that "will create shared bus and bike lanes throughout the project corridor and add a second general-purpose lane where it is feasible and needed to enhance capacity for vehicular traffic." In other words, and as described by the trial court, the Modified Project "restor[ed] the one lane previously designated for bus use to [general] vehicle use on Culver Blvd. connecting to Washington Blvd. so that there were again two traffic lanes, while combining the bus lane with the bike lane into a shared bus/bicycle lane in each direction." The City asserts and plaintiff does not dispute that the restoration of a bus lane into a general vehicle traffic lane affected approximately half a mile of the Corridor.

On July 10, 2023, the City directed its staff to move forward with the design of the Modified Project.

4

At a September 11, 2023, City Council meeting, the City's staff recommended that the City approve the final plans and specifications for "the Western Segment," which described the stretch of road on Culver Boulevard between Duquesne Avenue and Canfield Avenue, and Washington Boulevard between Ince Boulevard and La Cienega Avenue.[4]

The staff also recommended that the City adopt a resolution granting a CEQA exemption for the Modified Project. The staff opined that the Modified Project was exempt from CEQA pursuant to CEQA Guidelines section 15301, subdivision (c) because, as relevant here, it "does not create additional automobile lanes beyond those that existed in the pre-pilot [prior to the Original Project] condition."[5] And, in the staff's view, no exceptions to the categorial exemption applied. The staff opined that the unusual circumstances exception (see CEQA Guidelines, § 15300.2, subd. (c)) did not apply, reporting that: "Neither the Original Project nor the Modified Project will have a significant effect on the environment due to unusual circumstances. . . . [T]he proposed transportation improvements are located in an

---

[4] The City's staff also recommended approval of the "Eastern Segment" as part of the Modified Project. That portion of the project extended the boundary of the Original Project eastward by 0.6 miles, with construction to begin by mid-2024. Plaintiff does not contest that portion of the Modified Project on appeal.

[5] The staff further opined that the Modified Project was statutorily exempt pursuant to section 21080.25, and the City adopted a resolution exempting the Modified Project from CEQA based on this statutory exemption. Because we conclude the categorical exemption applies, we need not discuss the statutory exemption.

urbanized area within existing public roadway rights-of way. There are no sensitive natural resources of any kind within the boundaries of the transportation improvement areas or in the surrounding area, as the transportation improvement areas and surrounding area are fully developed with buildings, parking lots or other supporting urban infrastructure and there are no 'unusual circumstances' that would indicate a potential for any significant environmental effects. . . . The size, location, and configuration of both the Original Project and the Modified Project are in line with other similar mobility projects. The Original Project was previously determined to be exempt and covered by the Class 1 categorical exemption. . . . Furthermore, it can be presumed that a project such as the Modified Project that does not materially induce an increase in VMT [vehicle miles traveled] would also not induce single-occupancy vehicle trips since single-occupancy vehicle trips would be an element of any increase in VMT." (Fn. omitted.)

On September 11, 2023, the City approved the Modified Project and adopted a resolution exempting the Modified Project from CEQA.

C.      *Petition for Writ of Mandate*

On October 17, 2023, plaintiff, an unincorporated association comprised of members who participated in public hearings regarding the Original Project and the Modified Project, filed a petition for writ of mandate and complaint for declaratory and injunctive relief. Plaintiff sought, among other things, a writ of mandate to set aside the City's approval of the Modified Project and an injunction preventing the City from taking any action on

the Modified Project until the City prepared a full environmental impact report as required by CEQA.

On March 22, 2024, the City filed its answer, denying all the allegations.

In its opening brief, plaintiff argued, among other things, that the Class 1 categorical exemption did not apply, and that the Modified Project fell within the unusual circumstances exception to the exemption. In support, plaintiff filed a request for judicial notice of six exhibits.[6] As relevant here, Exhibit 2 was a seven-page excerpt from an economics textbook that we will describe further below.

In its opposition brief, the City contended that the Modified Project was exempt from CEQA as a Class 1 categorical exemption, and no exception to the exemption applied. The City stipulated to the admission of five of the six exhibits for which plaintiff requested judicial notice. It opposed, however, the request for judicial notice of Exhibit 2 on the grounds that it was not a proper document for judicial notice.

---

[6] Plaintiff also sought to include in the administrative record Exhibits 3 to 11, attached to its former counsel's declaration, which were footnotes with hyperlinks that were part of a letter from advocacy groups. The City objected to these exhibits. In its statement of decision, the trial court sustained the City's objection as to Exhibits 6 and 10, but admitted the other exhibits into the administrative record. Plaintiff does not challenge this ruling on appeal.

D.    *Statement of Decision and Judgment*

On June 5, 2024, the trial court held a hearing on the petition for writ of mandate and took the matter under submission.

On August 13, 2024, the trial court issued its statement of decision denying the petition.  The court found, among other things, that Exhibit 2 of the request for judicial notice was not a proper subject for judicial notice.  The court then concluded that the categorical and statutory exemptions to CEQA both applied, and no exception precluded the application of the exemptions.

On September 3, 2024, the trial court entered judgment denying plaintiff's petition with prejudice.  Plaintiff timely appealed.

## III.    DISCUSSION

A.    *Request for Judicial Notice*

1.    <u>Background</u>

Exhibit 2 of plaintiff's request for judicial notice was a seven-page excerpt from Levinson and King, A Political Economy of Access:  Infrastructure, Networks, Cities, and Institutions (2019) pages 247 through 253.  In that excerpt, the textbook authors described "induced demand" as an "idea," and continued: "In our use, *induced demand . . .* results from people changing route, schedule, mode, destination, or location of home or work within the existing built environment, or even choose [*sic*] whether to make a trip at all, because of a change in access."  In a

8

subsection entitled "*Defining induced demand,*" the authors stated, among other things, that "Demand is a function—not an amount." The authors continued: "Sequencing matters here, and it's hard to prove a negative. A single sequence of events cannot provide proof for induced demand. Maybe Shoeless Joe and the rest of the ballplayers were going to show up in Kinsella's Field anyway, and the field just accommodated them [referring to the movie *Field of Dreams*]. Just because they never showed up before he built the stadium is not the evidence we require. Instead, we need to compare multiple cases to justify our case, and build the evidence for it. [¶] A sequence of events can however disprove induced demand (or supply) . . . there are several cases where construction does not result in demand (we can conclusively disallow induced demand in that case) . . . ."

The trial court, in its statement of decision, declined to take judicial notice of Exhibit 2. The court determined that "[t]he very textbook pages submitted as Exhibit 2 shows the term 'induced demand' is not a predictor of when greater demand occurs," and cited portions of the excerpt above. The court continued that plaintiff "uses the term 'induced demand' to mean that the City's restoration of the second traffic lane . . . will significantly increase VMT. . . . [Plaintiff], however, offers no empirical evidence that VMT will increase when a vehicle lane is returned to general vehicle use, nor even that VMT decreased when that vehicle lane was restricted to bus use by the [Original Project]. [Plaintiff] provides no evidence to indicate that reducing two lanes of vehicle traffic to one lane for a distance [of] 1.3 miles . . . has had any effect on vehicle traffic on a 6 mile downtown

9

corridor.[7]  [Plaintiff] certainly can argue the issue, but the Court will not receive into evidence a definition of 'induced demand' that assumes that the [Modified Project] will increase vehicle traffic on the Culver/Washington corridor."

      2.    <u>Analysis</u>

"We apply the abuse of discretion standard in reviewing a trial court's ruling denying a request for judicial notice (i.e., we affirm the ruling unless the information provided to the trial court was so persuasive that no reasonable judge would have denied the request for judicial notice).  [Citation.]"  (*CREED-21 v. City of San Diego* (2015) 234 Cal.App.4th 488, 520.)  We find no error.

Plaintiff contends that Exhibit 2 was judicially noticeable as "[t]he true signification of all English words and phrases and of all legal expressions."  (See Evid. Code, § 451, subd. (e).)  Exhibit 2, however, is an excerpt from an economics textbook, not a dictionary or other similar reference (cf. *Castro v. State of California* (1970) 2 Cal.3d 223, 239, fn. 28 [discussing Evid. Code, § 451, subd. (e) and dictionary definition of "newspaper"]), and the exhibit, by its own terms, described induced demand as an economic "idea," not a "true signification" of an English word or phrase.  Further, the authors explained they were using the term "induced demand" in a particular manner, demonstrating that the term had more than one "true signification."  The trial court therefore did not abuse its discretion when it declined to take judicial notice of the exhibit.  (See *Linda Vista Village San Diego*

---

7    As explained above, the affected portion of the 1.3-mile Corridor was approximately half a mile long.

10

*Homeowners Assn., Inc. v. Tecolote Investors, LLC* (2015) 234 Cal.App.4th 166, 186 [declining to take judicial notice of newspaper articles and historical articles and brochures . . . and noting that "in any case, we would not take judicial notice of the truth of [the views in those publications"].)

## B.    *CEQA Class 1 Exemption*

We next consider the trial court's ruling that the Modified Project was exempt from CEQA.

### 1.    Applicable Law and Standard of Review

"On an appeal challenging a trial court's denial of a petition for a writ of mandate in a CEQA case, our task is the same as the trial court's.  [Citation.]  We conduct our review of the agency's action independently of the trial court's findings.  [Citation.] Accordingly, in this appeal we review [the] City's decision and not the trial court's.  [Citation.]

"A public agency's 'determination that [a particular] project [is] exempt from compliance with CEQA requirements . . . is subject to judicial review under the abuse of discretion standard in . . . section 21168.5.  [Citations.]  . . . Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.  [Citation.]  [¶]  Where the issue turns only on an interpretation of the language of the Guidelines or the scope of a particular CEQA exemption, this presents "a question of law, subject to de novo review by this court."  [Citations.]  Our task is "to determine whether, as a matter of law, the [project]

11

met the definition of a categorically exempt project." [Citation.] Thus[,] as to the question [of law] whether the activity comes within the categorical class of exemptions, "we apply a de novo standard of review, not a substantial evidence standard.'" [Citation.]

"In contrast, where a public agency makes a factual determination that a project falls within a statutory or categorical exemption, we apply the substantial evidence standard in reviewing the agency's finding. [Citations.] . . .

"In applying the substantial evidence standard, we review the administrative record of the public agency's decision (e.g., agency's determination that a CEQA exemption applies to a project) for substantial evidence to support that decision. [Citations.] Substantial evidence is evidence of ponderable legal significance that is reasonable in nature, credible, and of solid value. [Citation.] In applying the substantial evidence standard of review, all conflicts in the evidence are resolved in favor of the prevailing party and all legitimate and reasonable inferences are made to support the agency's decision. [Citation.] When two or more inferences reasonably can be deduced from the evidence, we cannot substitute our deductions for those of the agency." (*Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 409–410.)

"Generally, we apply the same rules governing interpretation of statutes to the interpretation of administrative regulations. [Citation.] '"We give the regulatory language its plain, commonsense meaning. If possible, we must accord meaning to every word and phrase in a regulation, and we must read regulations as a whole so that all of the parts are given effect. [Citation.] If the regulatory language is clear and unambiguous, our task is at an end, and there is no need to resort

to canons of construction and extrinsic aids to interpretation. [Citation.]" [Citation.] Our primary aim is to ascertain the intent of the administrative agency that issued the regulation. [Citation.] When that intent "cannot be discerned directly from the language of the regulation, we may look to a variety of extrinsic aids, including the purpose of the regulation, the legislative history, public policy, and the regulatory scheme of which the regulation is a part.'" [Citation.]" (*Berkeley Hills Watershed Coalition v. City of Berkeley* (2019) 31 Cal.App.5th 880, 890–891.)

2.    Analysis

As noted, the City determined that the Modified Project qualified as a Class 1 categorical exemption. "Class 1 consists of the operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of existing public or private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of *existing or former use*. The types of 'existing facilities' itemized below are not intended to be all-inclusive of the types of projects which might fall within Class 1. The key consideration is whether the project involves negligible or no expansion of use."[8] (CEQA Guidelines, § 15301,

---

[8]    Our Supreme Court has granted review on the issue of whether the term "negligible" for a Class 1 categorical exemption pertains to a negligible change in use, or to a change that presents a negligible risk of environmental harm. (*Sunflower Alliance v. Department of Conservation* (2024) 105 Cal.App.5th 771, rev. granted Dec. 18, 2024, S287414.) That issue is not before us on appeal. Instead, the parties dispute whether the change of use from a bus lane under the Original Project to its

13

italics added.)  Subdivision (c) provides:  "Existing highways and streets, sidewalks, gutters, bicycle and pedestrian trails, and similar facilities (this includes road grading for the purpose of public safety, and other alterations such as the addition of bicycle facilities, including but not limited to bicycle parking, bicycle-share facilities and bicycle lanes, transit improvements such as bus lanes, pedestrian crossings, street trees, and other similar alterations that do not create additional automobile lanes)." "Where the specific issue is whether the lead agency correctly determined a project fell within a categorical exemption, we must first determine as a matter of law the scope of the exemption . . . ." (*California Farm Bureau Federation v. California Wildlife Conservation Bd.* (2006) 143 Cal.App.4th 173, 185.)

Plaintiff argues that because CEQA Guidelines section 15301, subdivision (c) does not refer to "former" use, but only to "existing" streets, the exemption for projects that do not expand on a "former use" does not apply to the former use of streets.  We reject the argument.  CEQA Guidelines section 15301 uses the term "former use" to describe *all* Class 1 projects that fall within the "existing facilities" exemption, which necessarily includes the project types described as "[e]xamples" in the subsequent subdivisions.  Thus, the existing facilities categorical exemption applies to "existing streets" if the project results in "negligible or no expansion of . . . former use."

We next consider whether the City's use of the streets in the Corridor before the implementation of the Original Project constitutes a "former" use within the meaning of the Class 1 categorial exemption.  According to plaintiff, the Modified

prior use as a general vehicle lane constitutes "no expansion of use."

14

Project's proposal to change a bus lane into a general vehicle lane, and a bicycle lane into a shared bus/bicycle lane, does not fall within the categorial exemption described in CEQA Guidelines section 15301, subdivision (c) because it "create[s] additional automobile lanes" when compared to the use after implementation of the Original Project.

"Former" means "coming before in time," "of, relating to, or occurring in the past," or "preceding in place or arrangement." (See Merriam-Webster's Online Dict. (2025) <https://www.merriam-webster.com/dictionary/former> [as of Aug. 12, 2025], archived at < https://perma.cc/EZ2L-4AUL>.) Plaintiff's characterization of the "former" use of the challenged lanes is identical to the "existing use" of those lanes at the time of the agency's consideration. The Class 1 exemption, however, refers to both an "existing *and* former use." We therefore reject plaintiff's construction of the exemption. (See *Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1038 ["It is a maxim of statutory interpretation that courts should give meaning to every word of a statute and should avoid constructions that would render any word or provision surplusage"].)

The administrative history of the Secretary of the Natural Resources Agency's promulgation of the CEQA Guidelines and the categorical exemptions also supports the City's interpretation of "former use." (See §§ 21083, 21084.) In 2018, the Secretary amended CEQA Guidelines section 15301 to include a reference to "existing or former" use. Before 2018, CEQA Guidelines section 15301 provided: "Class 1 consists of the operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of existing public or private structures, facilities, mechanical

15

equipment, or topographical features, involving negligible or no expansion of use *beyond that existing at the time of the lead agency's determination*." (Italics added.) The Secretary of the Natural Resources Agency described the purpose of the amendment as follows: "It deletes the phrase 'beyond that existing at the time of the lead agency's determination.' Stakeholders noted that this phrase could be interpreted to preclude use of the exemption if a facility were vacant 'at the time of the lead agency's determination,' even if it had a history of productive use, because compared to an empty building, *any* use would be an expansion of use. [Citation.]" Such an interpretation is inconsistent with California's policy goals of promoting infill development. [¶] It would also not reflect recent case law regarding 'baseline.' Those cases have found that a lead agency may look back to historic conditions to establish a baseline where existing conditions fluctuate, again provided that it can document such historic conditions with substantial evidence. (See *Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 327–328 ['Environmental conditions may vary from year to year and in some cases it is necessary to consider conditions over a range of time periods' . . . (quoting *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 125); see also *Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316.)" Given the stated purpose of the "existing or former" use amendment to the Class 1 exemption, we agree that "former use" includes a use that precedes the use existing at the time of the proposed project.

Having interpreted the Class 1 exemption's reference to "former use" as a use that precedes the use at the time of the

16

agency's consideration, we conclude that the City's use, two years prior, of the street lane for general vehicle traffic was a "former use" within the meaning of the exemption.

## C.     *Unusual Circumstances Exception*

We next consider plaintiff's contention that even if an exemption would otherwise apply, the unusual circumstances exception under CEQA Guidelines section 15300.2, subdivision (c) precluded the exemption.

### 1.     Applicable Law and Standard of Review

CEQA Guidelines section 15300.2, subdivision (c) provides that "[a] categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances."

"The party challenging an agency's finding that an exemption applies bears the burden of producing evidence supporting that claim.  [Citation.]  In the context of the unusual circumstances exception, that typically requires a two-part showing:  '(1) "that the project has some feature that distinguishes it from others in the exempt class, such as its size or location" and (2) that there is "a reasonable possibility of a significant effect [on the environment] due to that unusual circumstance." [Citation.]'  [Citation.]  [¶]  We review the agency's factual determination as to whether there is a distinguishing feature—the first prong of the two-part showing—to see if it is supported by substantial evidence.  [Citation.]  . . .

17

[¶]  If there is substantial evidence of an unusual circumstance, we move to the second prong of the test—whether there is a reasonable possibility that the unusual circumstance will produce a significant effect on the environment.  The agency must apply the 'fair argument' standard in addressing this issue.  [Citation.]  Under that standard, "'an agency is merely supposed to look to see if the record shows substantial evidence of a fair argument that there may be a significant effect.  [Citations.]'"" (*World Business Academy v. State Lands Com.* (2018) 24 Cal.App.5th 476, 498–499.)

"Alternatively, the party advocating for application of the unusual circumstances exception may make a heightened, one-element showing:  that the project *will* have a significant environmental [impact] effect.  [Citation.]  If a project will have a significant environmental effect, that project necessarily presents unusual circumstances and the party does not need to separately establish that some feature of the project distinguishes it from others in the exempt class.  [Citation.]  We apply the deferential substantial evidence review when reviewing this one-step alternative for proving the exception.  [Citation.]" (*World Business Academy v. California State Lands Com., supra*, 24 Cal.App.5th at p. 499.)

## 2. Distinguishing Feature

According to plaintiff, the Modified Project is subject to the unusual circumstances exception because "[t]he decision to add new vehicular traffic lanes and to remove the pedestrian protections, bus lanes, and protected bicycle lanes . . . is highly

18

unusual" and would have "adverse environmental impacts (including human health and safety impacts) . . . ."

The City expressly found that the Modified Project was similar in size, location, and configuration to other mobility projects. Moreover, and contrary to plaintiff's characterization, the restoration of a former use of a traffic lane is not an "addition" of a vehicular traffic lane under CEQA Guidelines section 15301, subdivision (c). Indeed, by creating the Class 1 categorical exemption, the Secretary of the Natural Resources Agency has determined that restoring the former use of an existing traffic lane does not, by itself, have a significant environmental impact: "In listing a class of projects as exempt, the Secretary has determined that the environmental changes typically associated with projects in that class are not significant effects within the meaning of CEQA, even though an argument might be made that they are potentially significant. The plain language of [CEQA] Guidelines section 15300.2, subdivision (c), requires that a potentially significant effect must be 'due to unusual circumstances' for the exception to apply. The requirement of unusual circumstances recognizes and gives effect to the Secretary's general finding that projects in the exempt class typically do not have significant impacts." (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1104–1105.)

Plaintiff's citation to a letter from a Los Angeles city councilmember in support of its assertion that an unusual circumstance exists is inapposite. The councilmember, in a letter dated April 24, 2023, stated she was writing "to express [her] strong support for [the Original Project] . . . ." The councilmember, however, did not comment on the Modified

19

Project or opine that project included a feature distinguishing it from other traffic lane projects in the exempt class. Therefore, plaintiff cannot meet its burden to show the first prong of the required two-part showing and we need not discuss the second prong of the unusual circumstances test regarding fair argument.

### 3. Heightened Showing of Environmental Impact

We next consider whether plaintiff submitted substantial evidence to meet its alternative and heightened one-element showing that the project "*will* have a significant environmental effect." (*World Business Academy v. California State Lands Com., supra*, 24 Cal.App.5th at p. 499.)

According to plaintiff, it submitted "[e]xpert evidence . . . that [the Modified Project] . . . will lead to substantial increases in greenhouse gas emissions and air quality impacts . . ." and "will substantially increase the amount of [VMT] (and corresponding carbon emissions) . . . ." We disagree with plaintiff's characterization of the evidence.

The evidence cited by plaintiff is comprised of a letter written by its former counsel, letters from various advocacy groups, an e-mail from the Natural Resources Defense Council (NRDC), and submissions from other commentators, including a person working in the City who lived nearby, and a City resident. Although some of these letters included assertions that the Modified Project *will* result in an increase in carbon emissions and VMT, none can properly be characterized as "expert evidence." For instance, the letter submitted by plaintiff's former counsel asserted: "[A]ccording to the California Induced Travel Calculator by UC Davis, removing the protected bike lane in

20

favor of an additional lane of traffic on both sides of the project for 1.6 miles would induce 3.8M additional VMT per year, creating as much as 1326.98 metric tons of [$CO_2$] in the process according to estimates by the EPA Automotive Trends Report. That is about the same amount of $CO_2$ as is emitted by 288 cars for a typical year . . . ." Counsel, however, did not proffer that he was an expert on VMT and, as noted by the trial court, did not describe the underlying basis for his calculation of pollutants in that he did not explain what numbers he inputted into the "California Induced Travel Calculator." Further, counsel's conclusion was premised on a change to the use of more than the entirety of the Corridor, that is, 1.3 miles. The Modified Plan, however, anticipated traffic changes to only half a mile of the Corridor. Thus, former counsel's letter is better characterized as a legal brief that included technical assertions unsupported by expert testimony. (See *McCann v. City of San Diego* (2021) 70 Cal.App.5th 51, 87 [""[S]ubstantial evidence includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact." (§ 21080, subd. (e)(1).) "Substantial evidence is not argument, speculation, unsubstantiated opinion or narrative, evidence that is clearly inaccurate or erroneous, or evidence of social or economic impacts that do not contribute to, or are not caused by, physical impacts on the environment." (§ 21080, subd. (e)(2).)'"].)

Plaintiff also cited to other commentators who stated, among other things: "The removal of [the Original Project] will generate massive VMT"; and "'[c]onsistent and compelling scientific evidence suggests prenatal and childhood exposures to primary traffic emissions can cause onset and exacerbation of asthma, delayed lung function development, and childhood

21

leukemia,'" quoting the Environmental Protection Agency. Much like former counsel's letter, these submissions constituted lay opinion testimony that required, but was not based on, technical expertise, and do not constitute substantial evidence. (*Hilltop Group, Inc. v. County of San Diego* (2024) 99 Cal.App.5th 890, 921–922.)

Plaintiff's submission of an e-mail from the NRDC, dated April 17, 2023, also is not substantial evidence that the project *will* have a significant environmental impact. The NRDC asserted: "Because of the induced VMT that the proposed project would cause, we expect the project will generate pollution equivalent to the annual emission of approximately 600 to 700 passenger cars and light trucks burning approximately 300,000 to 365,000 gallons of gasoline. This equals up to 100,000 metric tons of carbon dioxide equivalent per year." (Fn. omitted.) The NRDC's calculation was based on a "preliminary estimate" and the author "used the Induced Travel Calculator from the National Center for Sustainable Transportation at UC Davis." But the author did not explain the basis for the calculation and thus the e-mail suffers from the same defect as former counsel's letter above. The e-mail was not substantial evidence that the Modified Project *will* have a significant environmental impact such that the project necessarily presents unusual circumstances. (*World Business Academy v. California State Lands com., supra*, 24 Cal.App.5th at p. 499.)

On this record, we conclude that plaintiff did not meet its burden to demonstrate that reverting a bus lane to a general vehicle lane along a portion of the Corridor will have a significant

environmental impact.[9]  Consequently, plaintiff could not establish that the unusual circumstances exception to the Class 1 categorical exemption applied.

---

[9]     Plaintiff also contends that the Modified Project will increase hazards to human health and safety.  Even assuming that the *safety* risks associated with increased automobile traffic supported a finding of a significant *environmental* impact, the comments cited by plaintiff do not constitute substantial evidence of such an impact.  The comments from local residents were comprised of lay opinion testimony and not substantial evidence. (*Hilltop Group, Inc. v. County of San Diego, supra*, 99 Cal.App.5th at pp. 921–922.)  The comment from an advocacy group based its opinion on an exhibit that the trial court excluded from evidence.  Finally, the NRDC e-mail asserted generally that increased traffic speed leads to increased injuries, and claimed that the Modified Project will increase vehicle speeds, but did not provide evidence that the Modified Project will increase vehicle speeds.

## IV.    DISPOSITION

The judgment is affirmed.  The City is awarded costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM (D.), J.

We concur:

HOFFSTADT, P. J.

MOOR, J.

24